## Case No. 3,024.

### The COLON.

[10 Ben. 60; 14 Am. Law Rev. 84.][1]

District Court, S. D. New York. Aug., 1878.

SALVAGE — DAMAGE TO CARGO BY DETENTION — COSTS—PARTIES—BURDEN OF PROOF.

1. The steamer C., while on a voyage from New York to Colon, became disabled on the 20th of August, 1876, by the breaking of her crankshaft. She was otherwise tight and staunch, was provisioned for several months, and could make some progress under sail. She was then about 200 miles from Nassau, N. P., and about 731 miles from New York, for which port her master determined to make. The weather was fine and the sea smooth. During that afternoon the steamer E., bound from Kingston, Jamaica, to New York, in answer to a signal from the C. came alongside, and an agreement was made between the masters of the two vessels that, the C., having requested to be towed by the E. to New York, the compensation for the assistance rendered should be settled by the companies in interest in New York. Each vessel furnished its hawser for the service, and the E. reached New York in safety with the C. in tow on the morning of August 26th, the weather during the voyage being fine, and the winds favorable. The C. was worth about $230,000, and her cargo was worth about $250,000, and she had 140 passengers. The E. was worth about $120,000. Her cargo was worth about $100,000, and she had thirty-nine passengers. She was detained about two days and a half in rendering the service. No agreement as to the amount of compensation for the services of the E. was arrived at between the owners of the two vessels. Two days after their arrival the owners of the E. demanded $150,000 salvage, and the next day filed their libel and attached the C. and her cargo for that amount. There was some delay in furnishing security, and the transhipment of the cargo of the C. to another vessel of the line to which she belonged, and the sailing of that vessel, were delayed thereby. Part of the cargo of the E. consisted of fruit, and its consignees intervened in the suit, claiming to recover the damages caused to such part of the cargo by the delay. It had been shipped under bills of lading which in terms authorized the E. to tow and assist vessels in all situations. On behalf of the E. it was claimed that she had been put to expense, amounting to $2,340, and that she had lost $2,500 freight on her next trip, but this latter claim was abandoned on the trial: *Held*, that the service rendered was a salvage service, but that the claim of the E. was exorbitant.

[Cited in Brooks v. The Adirondack, 2 Fed. 391; The Persian Monarch, 23 Fed. 822; The Wells City, 57 Fed. 319.]

2. The dangers to which both vessels were exposed during the service had been exaggerated.

3. The policies of insurance on the E. and her cargo not having been produced, the presumption was that by their terms the E. was authorized to render such services.

4. $10,000 was a reasonable compensation to the E. and her ship's company for the service rendered, $500 of it to be paid to the owners of the E. for expenses, $750 to the master of the E., and the rest, half to the owners of the E. and the other half to be divided among the officers of the E., including the master and her crew, according to their wages.

[Cited in The Benison, 36 Fed. 797.]

5. The owners of the cargo of the E. who had intervened might also recover the damages which they had sustained by reason of the detention, such damages being the difference between the value of their cargo when delivered and what would have been its value if delivered without detention; and that their right to recover such damages was not affected by the above mentioned clause in the bills of lading under which the cargo was shipped.

6. The libellants should not recover costs, except that the costs of the reference to ascertain the damage to cargo should abide the event.

In admiralty.

E. P. Wheeler and C. S. Souther, for owners of Etna.

W. R. Beebe, for crew of Etna.

S. H. Olin and J. H. Montgomery, for shippers of cargo by Etna.

T. E. Stillman for claimants.

CHOATE, District Judge. This is a libel brought by the owners, master and crew of the steamship Etna, against the steamship Colon and her cargo, claiming compensation as for a salvage service in towing her into the port of New York, when disabled by the breakage of her machinery at sea. Some of the consignees of cargo by the Etna have joined as co-libellants, claiming for damage through detention in the voyage to their goods, which being fruit, it is claimed became worthless or damaged by decay, before arrival, and which, but for the detention, would have arrived in good condition.

The Colon is an iron steamship of 2,686 tons burden, belonging to the Pacific Mail Steamship Company. She left New York on the 17th of August, 1876, with a hundred and forty passengers, and a crew of seventy-four men, including officers, and a general cargo of merchandise not perishable, valued at $250,000, bound for the port of Colon, by way of Crooked Island passage. On the 20th of August, at eleven o'clock in the forenoon, she broke her low pressure crank shaft in the crank. The effect of the accident was, that her machinery was wholly disabled, and her propeller rendered useless. By the accident two men were killed, the four columns that supported the cylinders were broken, and other parts of the machinery badly damaged. She was then in latitude 28° 17' north, and longitude 74° 4' west, about 731 miles from New York, and 200 miles from the nearest port, which was Nassau, New Providence. In all other respects, except as to her machinery, she was tight, staunch and strong. She had on board an ample supply of provisions to keep the sea for several months. She was a two-masted steamer, brig-rigged and furnished with two top-gallant sails, two upper top sails, two lower top sails, two courses, one fore stay sail, one fore top mast stay sail, one fore spencer, one gaff top sail, one main stay sail and one main spencer. At the time of the accident, the sea was smooth, the weather fine and the wind light from the W. S. W.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission. 14 Am. Law Rev. 84, contains only a partial report.]

About half an hour after the accident, the ship was got under all sail. The damage to the machinery was such that it could not be repaired at sea and the master decided to make for the port of New York. He then expected the Etna to pass within speaking distance, on her regular trip from Kingston or Port au Prince to New York, and the Acapulco, a steamship of the same line with the Colon, would be also due in that vicinity, in about three days, on her passage from Colon to New York, in case she took the Crooked Island passage. She sometimes took another route, which would have carried her a hundred miles further to the westward. Having got all sail on the ship, the master attempted to wear, but the wind being light and the propeller not being disconnected, he was unable to do so, and the ship made headway to the southward, about a knot and a half an hour, and drifted to the eastward, at about the same rate. After attempting to wear for about an hour, she made a French brig, and lay to, spoke and boarded the brig, and sent despatches by her. She then continued her efforts to wear, with the same result as before, until she made the Etna, which was at three o'clock and forty-five minutes in the afternoon. The course of the Etna was to the westward of the Colon, and she was bound to New York. The Colon set a signal which indicated that she wished to communicate close with the Etna, and soon after the Etna, in response to the signal, bore down upon her, the Colon bein then nearly abeam, and distant from six to eight miles. The Etna having rounded to under the lee of the Colon, the master of the Colon came on board the Etna and he and the master of the Etna had an interview, in which the master of the Colon told the master of the Etna that his machinery was disabled, and that he wished the Etna to tow him back to New York. After some hesitation on the part of the master of the Etna, it was agreed that he should do so. The subject of compensation was mentioned, and, at the suggestion of the master of the Colon, it was agreed that that should be left to be determined by the parties in interest in New York, and an agreement in writing was drawn up and signed by them, as follows: "At sea, August 20th, 1876. Lat. 28° 17' N., Long. 74° W. On board S.S. Etna. We, the undersigned, do hereby agree as follows: The P. M. S. S. 'Colon' being disabled as to her machinery, but in other respects tight, staunch and strong, asks the Atlas S.S. 'Etna' to tow her the 'Colon' to New York. The undersigned, Capt. S. P. Griffin, of the 'Colon,' stipulates that compensation for the assistance to be rendered shall be settled by the companies in interest in New York; and the undersigned, Capt. J. W. Sanson, of the 'Etna,' accepts the stipulation of Capt. S. P. Griffin, and for his part will render the assistance mentioned upon the terms stated."

The Etna was furnished with only one

hawser, suitable for the purpose of assisting in towing the Colon. It was a ten-inch hawser, which had been in use on the Etna for two years or more, but was in good condition. The Colon had a larger hawser, new, that had never been used. Before the captains separated, it was arranged that both hawsers should be used in towing. The agreement having been made, the master of the Colon returned to his ship. The hawser of the Colon was passed on to the Etna, and that of the Etna onto the Colon. This service was performed by the crew and the boat of the Colon. The hawsers were made fast to the after bitts on the quarter deck of the Etna on either side, and the Etna resumed her voyage for New York with the Colon in tow. They got under way about seven o'clock in the evening of the 20th of August, and arrived off Sandy Hook shortly before midnight, on the 25th, and came up the bay early in the morning, on the 26th. From the 20th to the 26th, the weather was fine, and the winds for the most part light and favorable, and during most of the time, the ships carried sail. They arrived in safety and without accident, except the stranding of the hawser of the Etna, on the 21st, which does not appear to have been caused by any defect in it. In consequence of the inequality in the strength of the hawsers, they were so arranged that that of the Colon bore a greater part of the strain of the towage than that of the Etna.

The Etna is an iron steamship of 1,274 tons burden, belonging to the Atlas Steamship Company (limited), running regularly between New York and ports in the West Indies, usually between Port au Prince and New York, but on this trip she stopped at Kingston, for the mails. On the 17th of August, 1876, she left the port of Kingston, Jamaica, with thirty-nine passengers and a general cargo of merchandise, valued at about $100,000. She also carried the mails from Kingston to New York. Her cargo consisted in part of fruit, bananas and limes, shipped green and liable to decay before arrival, if detained on the voyage. The value of the Colon and her stores was about $230,000. The value of the Etna was about $120,000. The regular and usual length of the Etna's passage, from Kingston to New York, is seven days, and but for the detention, she would have been due in New York early in the morning of the 24th. She was therefore detained two days. Her master claims that he was ahead of his time when he bore away for the Colon, and might have arrived on the afternoon of the 23d. So that the detention was at the utmost two days and a half.

All the cargo of the Etna was shipped under bills of lading which permitted the Etna to tow and assist vessels in all situations. All the cargo of the Colon was shipped under bills of lading, which exempted the Colon from liability for damage arising from ac-

cidents to the machinery. There is evidence that the defect in the crank, which resulted in the damage to the machinery, was a latent defect which could not have been discovered by examination prior to the breakage.

On the 26th of August, after the arrival of the ships at New York, Mr. Clyde, the president of the Pacific Mail Steamship Co., called on the agents of the Atlas Steamship Company, the owners of the Etna, and asked them to fix a sum for the service, as he desired to transfer the cargo and passengers of the Colon. No agreement was come to, nor any definite proposition made, but the same day the agents of the Atlas Company wrote to Mr. Clyde: "After conversation with Capt. Sanson, we find the matter of importance, and will require consideration; but on Monday, we hope to communicate definitely regarding the salvage of the steamship Colon." The transfer of the passengers and cargo of the Colon to the Crescent City, another steamship of the same line, was immediately commenced. On Monday, August 28th, the agents of the Atlas Company called upon Mr. Clyde. They stated to him that they should claim $150,000 at least; that that was their view of what the service was worth. Mr. Clyde replied that his views differed entirely from theirs; that he regarded it as a towage service only; that he thought it was not worth anything like that sum, that he would pay a fair compensation for it as a towage service. This was the substance of the conversation. And the interview ended without any definite proposition on the part of Mr. Clyde, and without any arrangement for further negotiation. Mr. Clyde had informed the agents of the Atlas Company, on the 26th, that the transfer of the cargo to the Crescent City would go on without delay, unless they interposed to stop it. On the 29th of August the Atlas Company filed their libel and attached the Colon and her cargo, thereby stopping the further transhipment of the cargo. They claimed in the libel $150,000 for a salvage service, and there was some delay in procuring the necessary bonds for the release of the ship and cargo, so that the Crescent City, which would regularly have sailed on the 29th, was delayed until the bonds were furnished. The libellants knew that the cargo was being transferred, and that, if not stopped, the Crescent City would leave port with it on Tuesday, the 29th, at noon.

The weight of testimony is that the part of the sea where the Colon's machinery became disabled, is not very much frequented by vessels, the vessels passing there being mostly small sailing vessels going between New York and the West India ports, by way of Crooked Island passage, and certainly that the Etna and the Acapulco were the only vessels capable of helping her to proceed on her voyage, which were likely to come near enough to assist her; and as to the Acapulco, the chance of her falling in with the Colon was subject to several contingencies. The current at that time and place was setting to the eastward, and before the Acapulco reached that part of her voyage, the Colon might have drifted so far to the eastward as not to be made from her. Although the master of the Colon believed he could have kept upon the track of the Acapulco, yet his success in doing so would depend greatly on the wind and weather. The drift to the eastward was about a knot and a half while she was attempting to wear. If she were lying to, it would, of course, be much less, and this easterly drift of the current was unusual at that place. The preponderance of the evidence also clearly is, that the Colon, by the aid of her sails alone, could be navigated at sea without danger, except on a lee shore; that with her screw disconnected she would make headway under canvas, with a moderate breeze, and that she could sail under canvas on a wind. Her screw was stationary, that is, it could not be raised out of the water, but could be disconnected from the shaft. The expectation of the master that if necessary he could make the port of New York under canvas, was not an unreasonable one.

It is claimed on the part of the libellants, that the service rendered was a salvage service of great merit; that the Colon was rescued from great and imminent perils by the Etna; that the Etna encountered great risks and incurred great expense and loss in rendering the service, and it was insisted upon the trial that the libellants were entitled to $150,000. That the service rendered is one that ranks as salvage, and not as a mere towage service, was conceded by the learned counsel for the Colon; but it is insisted that the alleged dangers to which the Colon was exposed, and those which the Etna encountered in aiding her, are mostly imaginary and that the expense and loss claimed to have been incurred and suffered are greatly exaggerated.

The first danger to which the Colon is claimed to have been exposed was from the condition of her machinery. By the breaking of the columns supporting the cylinders, great masses of iron, it is said, were left unsecured in the ship which in case of a storm might have shifted and rolled about and sunk the ship. The evidence is not very clear or satisfactory as to whether by the rolling of the ship the broken parts of the machinery would have endangered her safety, or to what extent this was so, or within what time this danger could have been guarded against, or what if any precautions could have been taken, in case of the sea rising, to secure these dangerous parts of the machinery temporarily. This particular danger was not referred to in the libel, nor does it appear to have been referred to in the conversation between the masters of the two ships on board the Etna. The only evidence

from which it can be inferred, is the nature of the breakage as before described, and the testimony of Captain Griffin, who said that it would take but an hour or an hour and a half to disconnect the screw and yet that he did not disconnect it till the night of the 22d, although it offered a considerable impediment to the progress of the ships while connected. And he gave as the reason for not disconnecting it sooner, that the men were at work securing the engine; that that was a most important thing to do at that time; that the heavy parts of the engine were adrift. From this evidence and from the nature of the damage it may I think be reasonably inferred that the ship was in some danger from this cause during the two days and some hours, and that the work was so important that the men in the engineer's department could not be spared to uncouple the screw, but this element of danger would be entitled to greater consideration if the libellants had shown more fully, by testimony, its nature, extent and duration. It is consistent with Capt. Griffin's testimony that his apprehension of the effect of the existing state of the machinery in case of a storm, may not have extended so far as the actual sinking of the ship thereby, and it is noticeable that while he was in company, on the 20th, both with the Etna and the French brig, there is no evidence that this danger to the lives of his passengers was referred to in either case as a reason for their lying by him, and that, while the master of the French brig offered to do all in his power, Capt. Griffin made no request that she should lie by him till this danger was passed. It does appear by the evidence that that part of the ocean is occasionally visited in July, August and September by hurricanes or circular storms lasting for about twelve hours.

But the Colon was not rescued from this danger, assuming it to have existed, by anything which the Etna did. The Etna furnished no men, nor was she asked to furnish any men, to aid in securing the machinery. Nor could she, if the bad weather had come before the machinery was secured, have saved the Colon or her cargo from this danger. The most she could have done would have been to stay by her and take off her passengers and crew. Her presence was undoubtedly a security to the lives of those on board the Colon against this somewhat remote, but on the evidence possible, danger.

The next danger to the Colon relied on arises from her location in a part of the sea little frequented by steamers and where, as is insisted, she would have certainly drifted to the eastward, out of the track of such ships as were likely to pass that way. This, however, appears to be an imaginary rather than a real danger. The infrequent chances she would have in those waters to find a suitable vessel to tow her, of course increased the chances of detention at sea, and so may be said to have enhanced the value to her

of the Etna's service; but she was in no danger at sea, and she was not so far from port and from the other routes of ocean steamers as to be in any sense lost or beyond the reach of help. if she found it impossible for want of favoring winds to make her port. She was tight and staunch and navigable at sea, and could have made some port, and she was well provided with boats, which she could have sent to some port or ports from which aid could be obtained. The prevailing winds of that season in that part of the sea are shown to be light and variable, and, if she had missed the Etna and the Acapulco, she simply would have run the risk, so far as her location is concerned, of being kept longer at sea and of being compelled to make or approach New York under canvas. She could hardly have failed, in approaching New York, to have fallen in with some steamer which could have towed her in.

The next danger insisted on is, that she was unmanageable under canvas on a lee shore. This also is mostly an imaginary danger. It is true, doubtless, that these long steamers are far less manageable under canvas on a lea shore than sailing ships. Generally they cannot tack, and in bad weather in that position are in greater peril, and they cannot sail by the wind as other vessels can, so that if they are caught with a heavy gale on a lee shore, with disabled machinery and not on soundings affording anchorage, they are in great peril; but the Colon was not in this position and in no danger of getting into such a position. If she had not been taken in tow but had proceeded under canvas, she would not have been on a lee shore until near the port of New York and the chances of her being caught there with a heavy gale blowing on shore were certainly very remote, and the chances of her being lost by this danger without possibility of anchorage or rescue altogether too remote to enter into the calculation of the value of this service. At the same time it is of course to have due weight in valuing the service rendered that the Colon was not as manageable as a sailing vessel, that her canvas was designed to aid her steam power and not to propel her independently of it. It is also claimed that the Colon was in danger of getting out of provisions, but this is not sustained by the evidence.

In fact, the principal value to the Colon of the service rendered by the Etna was that her passengers and her cargo, which were bound for Colon, were brought to New York at least nine days and perhaps a much longer time sooner than they would have reached that port but for the assistance so rendered; but that she was in any great or impending peril from which the Etna rescued her or her cargo, or in any danger, tending in any considerable degree to increase the value of the service of bringing her promptly into port, is not established by

the proofs. But with all these deductions from the extreme claim of the Etna, the service thus rendered to the Colon and her cargo, of being thus promptly towed into port, was a salvage service of great value, and its value is not diminished by the fact that the shippers of cargo by the Colon may have had no claim for damage growing out of the breakage of the machinery. The amount and value of the property rescued is not changed by this fact.

The risks run by the Etna have also been greatly exaggerated. She had taken on board at Kingston seventy-five tons of extra coal as ballast. Of this she used in getting to New York only twenty tons, leaving her about four days' supply on her arrival. She was therefore in no appreciable danger of exhausting her fuel. The supposed danger of collision with the Colon while towing her is too remote to be worth considering. It could arise only from bad management. It is a bare possibility of danger merely which exists in all towage services. It appears that there was some insurance on the Etna, but how much does not appear. The policies are not produced. In view of the nonproduction of the policies it would seem that the libellants have failed to prove a possible loss of insurance by deviation in towing the Colon, since it is a common provision in policies of insurance to permit the rescue of vessels in distress. The burden here is on the libellants, and the evidence is exclusively within their own control. The danger to the Etna chiefly relied on was that by the extra strain put upon her machinery it was in danger of becoming disabled. The attempt, however, to prove by the witnesses Petrie and Roberts, that her machinery was unduly strained and in fact injured by towing the Colon, failed; and upon the whole evidence I should not be justified in finding that she incurred any appreciable danger of disabling her machinery from the service rendered. And it is admitted by the master of the Etna, that the towing of the Colon imposed very little extra labor on the crew of the Etna. The Etna presents a bill of expense and damage amounting to $2340.65, besides the claim of $2500 for loss of freight on the next trip, which last item, however, was abandoned on the trial after considerable testimony had been taken on the subject. Of this claim for damages, the testimony sustains but a small part. The claim of $600 for a new shaft is clearly not proved. Long afterwards and after one or more intervening voyages, a new shaft was put in, but it is not shown that the necessity for it was caused by the extra work done on this voyage. Seventy-five dollars for injury to hawser, $100 for repairs to the deck, $200 for extra work on the engine, $125 for extra coal used will more than cover all damages and expense proved to have been incurred by the Etna. The sum of $484, claimed as paid in fines for detention of the mails, was not shown to have been paid. The engineer's log does not sustain the claim that after taking the Colon in tow the Etna was run under any increased pressure of steam or with any considerably increased consumption of fuel, and the entries in the log indicating greater trouble from heating of the machinery were shown to have been interpolated pending the trial.

While it is properly conceded by the learned counsel for the claimants that the service rendered is to be treated as a salvage service and not merely as a towage service, and is to be compensated accordingly, yet it is very manifest that it was for the most part wanting in those elements of danger, both to the property saved and to that rendering the salvage service, which have led to the giving of a large part of the value of the property saved. The rule as to the compensation is perhaps stated with as much certainty, by Sir John Nicholl in the case of The Clifton, 3 Hagg. Adm. 118, as the subject admits of, as follows: "The ingredients of a salvage service are: First. Enterprise in the salvors in going out in tempestuous weather to assist a vessel in distress, risking their own lives to save their fellow creatures, and to rescue the property of their fellow subjects. Secondly. The degree of danger and distress from which the property is rescued, whether it were in imminent peril and almost certainly lost if not at the time rescued, preserved. Thirdly. The degree of labor and skill which the salvors incur and display and the time occupied. Lastly. The value. Where all these circumstances concur, a large and liberal reward ought to be given, but where none or scarcely any take place, the compensation can hardly be denominated a salvage compensation; it is little more than a mere remuneration pro opere et labore."

It is unnecessary to discuss in détail the recent cases of salvage where the service rendered consisted of towing a disabled steamer into port, which serve in some sort as precedents and guides to the court in fixing the amount of the compensation. No two cases are exactly alike. The cases most nearly like this, though each of them differing from it in important particulars are: The City of Berlin, 37 Law T. [N. S.] 307; Pacific Mail SS. Co. v. Ten Bales of Gunny Bags [Case No. 10,648]; The Herman Ludwig, Vice Admiralty Court of Nova Scotia, unreported; The Saragossa [Cases Nos. 12,334 and 12,335]; The Rebecca Clyde [Id. 11,621]; The Emily B. Souder [Id. 4,455]. The case of the Amerique, L. R. 6 P. C. 468, being a case of derelict, has little analogy to the present.

The principle is, that the compensation should be such that it will offer a proper inducement to the rendering of these extraordinary services at sea, and yet not so great that it will deter the parties in need of aid from the acceptance of the service. Taking into account the large number of the Colon's

passengers and crew and the value of the two vessels and their cargoes, the distance from port at which the Colon was taken in tow, and the character of that part of the sea as being remote from the usual track of steamers, and the great value to the Colon of the service rendered in bringing her passengers and cargo into New York so quickly, with all the other elements of the question disclosed by the evidence, I think that the sum of ten thousand dollars will be a fair and liberal compensation to the Etna and her ship's company for the service rendered, and risks and expenses incurred in the service, out of which is to be paid to the owners of the Etna $500 for the damage to ship and hawser and for extra coal, and $750 to the master of the Etna, and one-half of the residue, $4,375, is also awarded to the owners of the Etna. The other half of the residue is to be apportioned among the officers and crew of the Etna, including the master, in proportion to their wages.

Upon the trial it was agreed that the amount of the claim of the consignees of the part of the cargo of the Etna should be determined by a reference, in case it should be decided that they were entitled to any compensation. Enough appears upon the proofs to show that by the lengthening of the voyage this fruit or some of it, which would otherwise have arrived in New York in sound condition, became damaged or worthless by decay. Two questions arise: First, whether the consignees, who are shown to have been the owners of the fruit, are entitled to any compensation, and secondly, if entitled to any compensation, on what principle the amount to which they are entitled is to be computed. That they are justly entitled to compensation is, I think, clear. The Colon requested, for her own benefit and the benefit of her cargo, the Etna to tow her into port, and for this purpose to lengthen her voyage two days or two days and a half. If in order to do so it would have been necessary for the crew or the passengers of the two vessels to consume any part of the cargo of the Etna which was eatable as food, no question would probably be made that the Colon must compensate the owner of that part of the cargo for the same, whether the shipper had agreed in that case not to hold the Etna liable for the loss or not. I see no reason why, in the suit of the owners of the Etna for the salvage, such a claim in such a case should not be included and adjusted. It grows out of the same transaction and is immediately connected with the service rendered, and the Etna as carrier, though absolved from liability, would still have been bailee of the property, with all other rights, duties and obligations of such bailee and carrier. So if it became necessary for the salving ship to throw overboard part of her cargo in order to render the service, the justice of the case would be the same, even though the ship were protected by a similar stipulation in the bill of lading. Now, instead of consuming the fruit or throwing it overboard at the request and for the benefit of the Colon, the Etna kept it at sea two days longer than it would otherwise have been kept at sea, and thereby its value was lessened. It is just as truly sacrificed at the request of and for the benefit of the Colon in this case, to the extent of the loss in value suffered, as it would have been if consumed or thrown overboard; and the fact that the fruit was shipped under bills of lading, permitting the Etna to take other vessels in tow, does not affect the question, except that in the one case the ship would be entitled to the damages because liable over to the shipper, and in the other case the shipper would himself be entitled to them. The bill of lading was a waiver of all claim of damage arising from this cause to the consignee as against the Etna, and as against her and her owners alone. The stipulation was not made for the benefit of other vessels, except so far as permitting the Etna to rescue them may be necessarily a benefit. Releasing such other vessel from such liability was not within the purview of the contract so made between ship and shipper. That stipulation was therefore no waiver of any claim for damages which the consignees or shippers might have against another vessel at whose request and for whose benefit their property might be with their consent taken or sacrificed. Nor would this clause in the bill of lading disable the Etna, as a carrier of the consignee's goods, to claim and recover such damages in this suit. Here, however, the consignees have joined as co-libellants, and by the course taken on the trial, their claim has been severed from that of the ship, their carrier. It will be observed that this is a claim for damage growing out of the salvage, not for salvage compensation properly so called, and there is nothing in the cases cited by the claimants' counsel which prevents the allowance of such a claim. While those cases establish the general proposition that cargo of the salving ship is not entitled to share in the salvage, yet they do not deny but recognize the right of the salving ship, being liable over to the shipper, to recover the resulting damage to cargo as one element of the salvage award, unless the ship has been released from this liability to the shipper; and, if the shipper has so released the ship, they also recognize the right of the shipper to recover what the ship would otherwise have recovered on that account. The Nathaniel Hooper [Case No. 10,032].

The only remaining question is as to the rule of damages to be applied to this case. It is insisted by the claimants that the ordinary rule of damages in case of damage to property lost or destroyed at sea, should be applied in this case; that according to that rule the amount of damage, recoverable for

that part of the fruit which became worthless, is its cost in Jamaica, with the expense to the owner of shipping it and getting it to the place where it was lost. It is true that this rule of damage is firmly established in cases of property lost or destroyed before it reaches port. It is held that the value it would have had if it had reached port in safety, cannot be considered in determining its value at the place of loss, because it is a mere possibility that it would have ever reached port, even if it had not been lost as it was lost. The rule has been adopted as excluding merely speculative profits, and as furnishing a convenient and in its general application a fair measure of the value of property lost or destroyed at sea. But there is no reason for applying the rule in this case. The goods did arrive. They were not lost at sea. The question is, what damage the owner has sustained by receiving them in the condition, in which they were delivered on the day of their arrival, instead of in the condition they were in on the day when they would have arrived but for the detention. It is of course a question of fact to be determined whether on Thursday morning, Aug. 24th, they were still sound, and how far they had deteriorated in value when actually delivered. To allow this difference in value to the owners, is not to allow them speculative profits. It is simply to allow them the amount of loss which, at the request and for the benefit of the Colon, the owners have suffered. The rule alluded to has, it is believed, not been applied where goods have arrived, after suffering injury at sea. It has been customary in cases of salvage to make a liberal allowance for expense and damages incurred; but independently of that consideration, these consignees are entitled to their damages actually sustained, and it must be referred to a commissioner, if the parties do not agree, to compute the amount on the basis of this opinion.

The interview between Mr. Clyde and the agents of the Atlas Company, on August 28th, disclosed such a total diversity of views as to the claim which is the basis of this suit, that either party may properly have inferred that no further negotiation was desired, unless asked for; and as no suggestion of the kind was made, I think that the immediate bringing of a suit would not have been oppressive, or a ground for withholding costs from the libellants, if the claim made in the libel had not been exorbitant. But the claim was exorbitant, and made in a way which subjected the claimants to unnecessary trouble, expense and annoyance. The amount of security exacted was unnecessarily large. The libellants also subjected the claimants to the expense and trouble of producing evidence and defending against a claim for loss of freight, which was afterwards abandoned, but which the agents of the Etna should have discovered to be unfounded before coming into court. The libellants will therefore recover no costs, except that the costs, as between the consignees of the fruit and the claimants from the time of the order of reference, will abide the event. Decree accordingly.

[NOTE. For decision overruling claimants' exceptions to the commissioner's report, see Case No. 3,025, next following.]