## The Benison.[1]

### Seamen et al. v. The Benison and Her Cargo.

#### (District Court, S. D. New York. November 23, 1888.)

**1. Salvage—Vessel Damaged by Collision—Towage—Compensation.**

The steam-ship Benison, while on a voyage from Matanzas to Philadelphia, came into collision with another steamer, by which her bow and stem were carried away down to her foot, and nearly back to her collision bulk-head. The bulk-head prevented her sinking, but there was apprehended danger of its giving way. The steam-ship Hudson, bound from New York to New Orleans, observing the signals of distress set by the Benison, bore down to her, and took her in tow. The weather and the sea at the time were calm, but the Benison, owing to the loss of her stem, could not be steered straight, but surged from side to side, twice parting the towing hawser, and threatening collision with the Hudson. After about 10 hours' towage she was brought in safety to Hampton Roads. The value of the Hudson was about $250,000. The Benison's cargo saved was worth about $150,000, and the vessel herself was subsequently sold at auction for $40,500. *Held*, that the peril of the Benison was great, and the service of the Hudson of no small merit. $7,500 was therefore awarded as salvage, besides the damage to the Hudson.

**2. Same—Special Damage to Salving Vessel.**

In addition to her claim for salvage, the Hudson claimed a large sum for damage received by her machinery during the towage, and for detention. The evidence indicating that some parts of the machinery claimed to have been especially hurt had been about two-thirds worn out before this service began, and that the strain of the towage had completed that damage, and there being doubt about the other damages, *held*, that the Benison should be charged with one-third the cost of the whole repairs, including the detention of the vessel for that purpose.

**3. Same—Value of Damaged Vessel.—Auction Sale.**

A vessel damaged by collision having been sold at auction, and it appearing that the auction sale was fully attended; that the vessel had been previously examined by various persons, who afterwards attended and bid at the sale; and that her owners suffered her to pass into other hands,—*held*, that the price realized on such a sale was on the whole the most certain evidence of her market value in her damaged condition.

**4. Same—Costs.**

It is important that claims for special damage incurred in rendering a salvage service should be fully made known at the outset of a case, and opportunity given to contestants to attend any surveys that may be made; and where such claims were not advanced until the trial, even though full opportunity was thereafter given contestants to meet such claims, *held*, that costs would not be allowed to libelants.

In Admiralty. Action by the owners of the steam-ship Hudson, of the Cromwell line, against the English steam-ship Benison and her cargo, for salvage services rendered in towing the latter steam-ship, when disabled, from a point about 60 miles E. S. E. from Cape Henry into Hampton Roads.

*John E. Parsons*, for libelants.

*Butler, Stillman & Hubbard*, (*Wilhelmus Mynderse*, of counsel,) for claimant.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

BROWN, J. The above libel was filed by the owners of the steam-ship Hudson to recover salvage compensation for towing the English steamer Benison into Hampton Roads in May, 1888. The Benison was an iron steam-ship, built in 1883, 245 feet long, 34 feet beam, 24 feet draught, with two decks, and of 1,736 gross tons. She was fully loaded with a cargo of about 2,200 tons of sugar in bags, and on the 6th of May, 1888, when about 60 miles E. S. E. from Cape Henry, in a dense fog, came in collision about noon with the Eureka, by which her stem and bows were carried away, down to her foot and nearly back to the collision bulk-head. Her iron plates were left projecting from 12 to 14 feet forward of the bulk-head on each side. The weather and sea were calm, and signals of distress were immediately set, and help requested. The Hudson is one of the Cromwell line of steamers, plying between New York and New Orleans. She was 284 feet long, 34 feet beam, 24 feet deep, and of 1,873 gross tons. On her southward course, observing the Benison at a distance, apparently not under control, and exhibiting signals of distress, the master bore down towards her, reaching her a little before 2 P. M., and, after a conference with the master of the latter, took her in tow upon a hawser supplied by the Hudson, starting about 3 P. M., and arriving within two or three miles of Thimble Shoal light about 4 next morning, in anchorage ground, where they waited for day. After day-light the Hudson accompanied the Benison inwards until she got a tug along-side, and then resumed her voyage to New Orleans. The Benison, after being taken to Norfolk, and receiving some slight temporary repairs and protection to her bows by planking, was taken to Philadelphia in completion of her voyage.

The only questions before me are the amount of compensation that should be awarded, and the value of the Benison, for the purpose of apportioning this compensation between her and the cargo. The admitted value of the Benison's cargo saved was $150,000. The evidence as to the value of the Benison in her damaged condition ranges from $30,000 to $70,000. She was sold at auction for $40,500. She was subsequently repaired at an expense apparently of not more than $15,000 or $20,000, and, having thereupon obtained by special act of congress an American register, which, according to the testimony, would add 60 per cent. to her market value in this country, was deemed worth $135,000. During the year previous she had been insured by her English owners under a valued policy at the sum of $97,500, and after the collision the owners received on a settlement with the insurers about $72,000 in money, and retained the vessel, and the policy was canceled. The policy contained the usual clause limiting the liability of the insurers in case of collision to three-fourths of the insurance. It is urged that the insurance value ought not to be considered as evidence of the actual value, because, under the English law holding the owner in case of collision to a liability to the extent of £8 per ton, the policy should be regarded as an indemnity policy against the liability for collision; $72,000 being about the amount of the liability of the owners upon the Benison's tonnage, and the full policy of $97,500 being necessary to secure $72,000 under

the three-fourths collision clause. But considering that steam-ships are subject to many other dangers of loss or damage than collision, and that for loss through any of these other causes the owner could recover on abandonment up to her valuation of $97,500, the explanation offered is not satisfactory, in the absence of any evidence that the common understanding between the insurers and the assured was that the value was fixed in reference to the statutory limit of liability on collision. I think it is clear, however, that she was insured much beyond her actual value as an English ship. Irrespective of the auction sale, I should be inclined, upon the whole evidence, to fix her probable value as a British ship in her damaged condition at from $50,000 to $55,000. But considering the uncertainty of all such estimates; the fact that the auction sale was fully attended; that she was previously examined by various persons desiring her for different purposes, who attended and bid at the sale; and that her owners themselves suffered her to pass into other hands,—I am disinclined to depart from the auction price, or to hold that such a sale, evidently fairly conducted, and on full competition, is not on the whole the most certain evidence of her market value. I fix her value, therefore, at $40,500, for the purpose of assessing the salvage charges. This makes the aggregate value of the property saved $190,-500. The value of the Hudson was about $250,000, and her cargo the same. Her policies and bills of lading permitted her to tow and assist vessels in all situations. The weather and sea being calm, there were no other elements of difficulty, risk, or danger to the salvors than such as naturally attend the towage of so large a steamer, which, through the loss of her stem, could not be steered straight. The hawser was broken twice; the period of actual towage was about 10 hours; the extra coal consumed, 24 tons; extra oil, 5 gallons; and the detention of the Hudson was about 24 hours.

Aside from the question of damages occasioned to the Hudson during the towage service, the most material point in controversy is the degree of the Benison's danger when the towage service was begun, and her need of that service. For the claimant it is contended, and the master testifies, that she was in no immediate danger; needed no towage; could have reached Hampton Roads at about the same rate of speed as with the Hudson's help; required a convoy only; and that a convoy was all that he requested. The master of the Hudson testifies that the Benison's master stated that the reason why he desired a convoy was because he feared that the bulk-head would give way if he was towed; that the former considered there would be less danger to the bulk-head from towage, because the speed and the steering of the Benison, which, in her condition, was liable to steer wildly, could be better regulated. The towage service was consequently agreed on and accepted; and some efforts, not of much service, were made to relieve the front pressure by canvas stretched across the bow. The testimony of the master of the Benison seems to me disingenuous. He is reluctant to admit the evident and great apprehension that he felt for the safety of the ship. After her stem was carried away by the collision, the steamer settled down from

two to three feet by the head, and the water rose at once two or three feet above her forecastle, or lower deck, and afterwards somewhat more. There was not only great fear that the collision bulk-head might give way, but the giving way of the hatch and wooden trunk leading from the forecastle deck into the chain-locker, immediately behind the collision bulk-head, would speedily cause the vessel to fill. The hatch-cover of the wooden trunk was some two or three feet under water, and was only kept down by shoring fitted by the carpenter. The hatch, however, was not tight; and one witness testifies that on arrival at Norfolk the joints of the wooden trunk were started apart. At 6:30 P. M. the Hudson was stopped by signals from the Benison, and the latter's small boats were swung off by order of her captain; and her crew, with their clothing, and with the private instruments and effects of the master and other officers, were all sent aboard the Hudson, lest the bulk-head might give way, and the steamer sink, during the night. They stayed on the Hudson till the next morning; only the master, first officer, engineer, carpenter, and two other men remaining on board the Benison, who kept a small boat ready for instant use in case of further disaster. Nothing further, however, gave way. But it is evident that during the towage considerable water must have got in behind the collision bulk-head, as the donkey steam-pump aft was kept going continually, which was not required in the Benison's previous condition. This water must have come partly through the trunk of the chain-locker, and partly at the stringers on each side of the ship, where it oozed through the bulk-head to some extent, and ran down upon the bags of sugar underneath. I think the evidence shows that the steamer settled somewhat more by the head, through the addition of water; but when the water made its way aft it was controlled, after reaching the level of the stern pumps, by the constant use of those pumps. The consequent loss of sugar was therefore small; only about 280 bags out of 22,000 being damaged.

The Benison, in my judgment, was in a situation of great peril. Any unfavorable weather would have been likely to carry her to the bottom speedily, either by the giving way of the bulk-head, or by rending off the sides of the projecting plates. It was impossible at that time to tell to what extent the bulk-head, or the junction of the bulk-head and the projecting sides, had been strained or weakened by the carrying away of the bows. The recent instance of the Iberia, though not in evidence, illustrates the fact of such dangers, which, indeed, common knowledge recognizes. The situation of the Benison was much more dangerous than that of *The Colon*, 10 Ben. 60, or *The Leipsic*, 10 Fed. Rep. 585, to which my attention has been called; for both of the latter had only broken their shafts, and there was no doubt of their ability to reach port by sail. The behavior of the officers and men at the time, though the sea was then calm, is the strongest possible proof of their judgment of the matter; and the fact that the Benison might, in calm weather, have succeeded in reaching Hampton Roads, does not seem to me to lessen the actual danger, or the urgent need of the Hudson's services. Even if the Hudson had consented to act as convoy merely, on the attempt of the Benison to

steam into Hampton Roads, it is doubtful whether her necessary sea-men and firemen would have been willing to remain on board during the night to serve her; as above stated, they left her at 6:30 P. M., and a stop was made at that time for no other purpose. The services of the Hudson were neither easy nor unattended by danger, on account of the irreg-ular steering of the Benison. They made from five to seven knots an hour; but, being deep by the head, and with no stem, the Benison could not be held to her proper course. She ran first upon one side and then upon the other, rendering management difficult; and at about 4 A. M., when they were in the narrow channel way near Thimble Shoals and had swung nearly stern to stern, the Hudson was compelled to cut the haw-ser over her stern. And at the beginning, when the two were lying near each other, collision through the sudden sheering of the Benison was narrowly avoided. A special watch was constantly maintained at the stern of the Hudson for the purpose of counteracting, as far as possible, the surging of the Benison from side to side. Nevertheless, the Benison occasionally would run off at an angle of 45 deg. from the Hudson on either side; and in one of these lurches, at 8:30 P. M., the hawser was broken. Upon this branch of the case, therefore, although the sea and the weather were favorable, there were some special difficulties and hazards in the towage; and, as respects the peril and the value of the Benison and her cargo, the urgent necessity of immediate help, and the promptness and effectiveness of the Hudson's services, her claim is one of no small merit. For her services I allow $7,500.

A further claim is presented for about $7,070, for injuries caused to the Hudson's machinery by the towage service; and for $6,500 more for her detention during the consequent repairs. On her return from New Orleans to New York, on completion of the towage voyage, upon an examination it was found that the keys of the propeller were loose, and the hub cracked and forced about an inch forward upon the tapering shaft, so as to work upon the flange of the stern bushing; that the brass sleeve of the shaft at the outer stern-bearing was loosened, shoved forward, and somewhat broken at each end; the *lignum vitæ* tube or bushing that formed the outer stern-bearing, was worn through into the brass sleeve of the bushing; and this sleeve was broken into three pieces by one cross-section and one longi-tudinal section. These were serious injuries. If they were the proper effects of the towage service alone, the libelants are as much entitled to be made whole for these damages, and for the necessary detention of the Hudson while repairing them, as for the loss of a hawser in the same service, so long as they would not exceed "the recognized limits of sal-vage awards." *The City of Chester*, 9 Prob. Div. 182, 190; *The De Bay*, 8 App. Cas. 559. In the case of *The Colon*, *supra*, $300 was allowed for injuries to the deck and machinery, and $2,200 for damage to the cargo of green fruit through the increased delay. The chief difficulty is usu-ally in determining whether the alleged general damages to the salving ship or machinery have been caused by the salvage services. *The Alaska*, 23 Fed. Rep. 597, 610; *City of Chester*, *supra; The Colon*, 10 Ben. 73. The injuries alleged in this case are specific; not such as general strain

merely. The libelant's superintendent contends that they were wholly caused by the salvage service, from the extra strain upon the machinery in towing so much additional dead weight, and from the frequent changes made necessary in backing and going ahead under the severe strain; and that these things would fully account for the loosening of the keys, which, it is said, would necessarily be followed by a play of the propeller back and forth upon every reversal, with the accompanying shocks, which would naturally lead to the cracking of the hub, and the forcing of it against the outer flange of the bushing, thereby interfering with the lubrication of the bearings, and causing the wear, tear, and breakage afterwards found. One other witness concurs in this view, as respects such results after the keys became loosened. Seven experts called on the part of the respondents do not recognize in the towage service anything naturally producing such results, if the machinery were previously in a sound condition.

So far as I am able to understand mechanical principles, I cannot find in the extra dead weight of the towage service, or in frequent reversing alone, any sufficient explanation of the extraordinary wear through the *lignum vitæ* of the stern-bearings. So far as I understand, this wear, unless accompanied by hammering, is due to friction, the amount and effect of which, under proper lubrication, are dependent on the weight or pressure of the parts, and the speed of revolution. Other circumstances being equal, I cannot perceive how the mere additional dead weight astern during the towage service should materially affect the wear of the bearings, since the pressure on the bearings remained the same, and the speed of revolution was in fact diminished. The evidence shows that about eight months before, when the steamer was upon the dry-dock, the bearings were found worn down a quarter of an inch, after several years' use. On the examination after the salvage service they were found worn down about five-eights of an inch. On April 21st, when the steamer was in New Orleans on the trip previous to this service, the log contains the entry: "After examination, found propeller blades touching shoe." Her blades were accordingly clipped at that time. The bearings must, therefore, have been already considerably worn down. The evidence does not show exactly the original space between the blades and the shoe. The log also shows that on the evening of May 6th, after the hawser was first broken, the "wheel was discovered to be loose," which, as the engineer testifies, was inferred from a peculiar noise noticed on reversing. This was before the towage service was half completed. I am satisfied that the trouble began with the loosening of the keys; and, though it is possible, it is not probable, that this originated in the towage service. For it is not testified, and I see no reason to suppose, that reversing, with a tow behind on a hawser, subjects the propeller, or the bearings, while the keys are tight, to any more strain than reversing under ordinary circumstances; nor is any previous experience cited as specially connecting heavy towage with loosening of the propeller keys. From the natural probabilities, as they seem to me, as well as from the preponderance of expert testimony, it is more probable that the loosening

of the keys began on the previous voyage, from the contact of the blades with the shoe, and the previous working of the propeller so near the shoe as to make the water operate "like a hard substance." This would produce a succession of vibrations or shocks liable to loosen the keys; and, if once started, the loosening would be naturally increased by the frequent "racing" of the engine on the tempestuous passage that followed. Afterwards, the frequent reversals during the towage service, and the play of the propeller back and forth on the shaft, might naturally, and in the manner described by Mr. Coryell, be followed by the various, injuries afterwards discovered. There are no means of determining with certainty whether the hub was cracked on the previous voyage or during the salvage service. If there had been frequent contacts of the propeller blades with the shoe before the blades were clipped, plain marks would have been worn upon the shoe. None were seen during the repairs. Marks of slight contact might either have been effaced, or not observed; and shocks to the propeller in playing back and forth after the keys were loose, on the frequent reversals during the towage service, are as adequate to explain the cracking of the hub as the previous contact with the shoe, which must have been for a brief period. But the fact that the wheel, after the keys were first loosened, would naturally remain fast upon the tapered shaft while working ahead; the fact that there was afterwards very little reversing until the towage service; and the fact that no looseness of the wheel was noticed until about the middle of the towage, when the changes and consequent shocks upon the wheel had become frequent, favor the probability that the cracking of the hub may have arisen then. Whether the hub became cracked then or before, I have no doubt that the injuries to the shaft-sleeve and the bushing arose through the ultimate contact of the hub with the flange of the outer bearing during the towage service. The interference with proper lubrication thereafter, and the shocks of the wheel playing back and forth on frequent reversals, seem to me far more likely to have caused the rapid wear of the lower part of the *lignum vitæ*, and the breakage of the bushing and the sleeves, than any other cause.

The fact, which I think must be found, that the keys had become loosened before the salvage service was entered upon, and that the Hudson's machinery was in that respect defective, and exposed her to the liability of special damage in rendering the salvage service, does not affect the justice of her claim to be made whole for any actual injuries sustained. No improper management of the Hudson, or of her machinery, while rendering the service, is charged or proved. The principle on which salvage compensation is awarded is to afford sufficient encouragement to masters and owners to take all risks of person or property necessary for the rescue of other vessels in imminent peril. Ships in distress must be aided by means of such vessels as may be at hand, whether in perfect or in defective condition. Where, as in this case, the defect of loose keys was not suspected, and special damages were sustained, within reasonable limits they should be made good. Nor is the same strictness of proof that is required in cases of contract, or of tort, as to the cause of

the damage, to be exacted, when from the nature of the case such proof is impossible. The peculiar grounds of salvage compensation are still applicable. The property saved, within the recognized limits of salvage awards, ought to bear all the risks of the service; and the necessary encouragement of such service to vessels in distress demands that when the lack of certainty in the proof as to the moment or cause of damage is unavoidable, an adjustment ought to be made that does not throw all the risk of such uncertainties upon the salving vessel, but which shall afford at least such a reasonable degree of satisfaction, in view of these very difficulties and uncertainties, as shall not leave owners in doubt whether they are to get compensation for the risks incurred in such services or not. The evidence shows with reasonable certainty that the bearings before the salvage service must have been so worn down that about two-thirds of their natural life was spent. The salvage service practically consumed the rest. This service should therefore be charged with one-third the cost of replacing the injured parts, including the detention of the vessel for that purpose; and, in the unavoidable doubt that exists as to the time of the break in the hub and the bushing, it is, I think, so closely connected with the salvage service that the same apportionment ought to be made as to those repairs also. The amount allowed will therefore be made up as follows: Salvage service itself, $7,500; one-third of repairs to machinery, and of the detention of the Hudson, at $150 per day, $4,406.84; damage to cable, and extra coal and oil consumed, $475.66; total, being 6½ per cent. on value, $12,382.50; to be paid by the ship and cargo in proportion to their values as above found. Of the $7,500 allowed for the service, three-fourths, together with the last two items of $4,406.84 and $475.66, should go to the owners of the Hudson; and the one-fourth of the $7,500 to the master, officers, and crew; of which one-fourth the sum of $300 is to be paid to the master, and the residue to the master, officers, and crew, in proportion to their wages.

The claim for damages and detention was not stated in the libel. Though some reference was made to it in the negotiations, it was not presented in any definite form. No notice of the survey was given to the respondents, nor did they understand that any such claim was made, until after several of the defendants' depositions had been taken, and after the trial had been commenced. This operated to some extent as a surprise to them; and, though full opportunity was given to meet this claim, and although it has been allowed so far only as seems just, I deem it so important that such demands should be fully made known at the outset, and opportunity given to the contestants to attend the surveys when practicable, that, in the absence of this, costs will be withheld, that it may not be supposed that the court looks with indifference upon this practice. It is with reluctance that the court has felt constrained to make this disposition of costs, since the cause, though sharply litigated, has on both sides been conducted with the most friendly consideration for the convenience of each other and for the common interest.