## THE WELLS CITY.

### MORRIS BEEF CO. v. THE WELLS CITY.[1]

#### (District Court, S. D. New York. June 28, 1893.)

1. SHIPPING—BILL OF LADING—STIPULATIONS—PRIVILEGE TO TOW AND ASSIST VESSELS—CONSTRUCTION—PERISHABLE CARGO.

The implied and paramount obligation of the ship as respects perishable cargo under the usual bill of lading is to deliver it seasonably, and all minor stipulations are to be construed as subordinate to and consistent with that duty: hence the clause permitting the ship to "tow and assist vessels in all situations" cannot be held to authorize a subversion of the voyage, and a ship which, in view of such a clause, should undertake a salvage service, knowing that her cargo must necessarily suffer from the consequent delay, would be bound to make compensation for the loss inflicted on the cargo.

2. SAME—NECESSITY FOR KNOWLEDGE OF LIABILITY TO LOSS.

A vessel carrying a cargo of chilled beef, and whose bills of lading authorized her to tow and assist vessels in all situations, rendered a salvage service to another vessel, by reason of which her own voyage was delayed three to four days, causing damage to her cargo. The evidence indicated that the master could not properly be charged with knowledge that the delay would so injure his cargo. *Held* that, as the salvage service was apparently authorized by the privilege clause in the bill of lading, the master's knowledge of the likelihood of damage to his cargo on undertaking the service must be made to appear, and, for lack of that, the libel should be dismissed.

In Admiralty. Libel for damage to cargo. Dismissed.

McFarland & Parkin, for libelant.
Convers & Kirlin, for claimant.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

BROWN, District Judge. The above libel was filed to recover for damage to cargo during a salvage service rendered by the steamship "Wells City" to the steamer "Catalan," which was found disabled by the Wells City on her voyage in October last, from this port to Bristol, and was towed about 900 miles to the port of Valencia on the Irish coast. On a suit for salvage in the admiralty division of the high court of justice in England, an award of £2650 salvage was made on the 21st of November, 1892, upon an agreement between the parties to the suit, in which the libelant was not represented. The libelant claims that it sustained special damages through the delay consequent on the rendering of the salvage service, which entitled it to compensation for its loss.

The libelant had shipped to Bristol a quantity of chilled beef in refrigerators. The contract of shipment authorized the ship to "tow and assist vessels in all situations." The usual time of the passage of the steamers of the Wells City Line from New York to Bristol is 16 days. The vessel sailed from New York on the 16th of October, fell in with the Catalan on the 28th of October, left her moored in the harbor of Valencia on the 4th of November, and after coaling, reached Bristol on the 7th,—a passage of 21 days.

I find upon the evidence that the detention occasioned by the salvage service amounted to from three to four days. During the first part of the voyage the ship had experienced rough weather, and when she fell in with the Catalan on the 28th, she was already at least one day behind her usual progress. Any extension of the voyage beyond 19 days, according to the libelant's evidence, was certain to be attended with injury to the chilled beef before it could be marketed.

For the libelant it is contended, that this injury was so certain and inevitable, and that the liability to damage was so well known to all engaged in the business, that it must be deemed to have been known to the master also; and that therefore his undertaking to tow the Catalan into port, which he knew would prolong the voyage considerably beyond 19 days, was equivalent to a voluntary and deliberate choice to sacrifice the libelant's beef to the earning of a salvage award; and that the stipulation in the bill of lading giving the privilege "to tow and assist vessels in all situations" cannot properly be construed to authorize such a deliberate sacrifice of cargo without compensation.

Contracts, like statutes, are to receive a reasonable construction. This maxim is liberally and especially applied to the general, printed forms of mercantile and shipping instruments, in furtherance of the presumed intent of the parties. Abb. Shipp. 250–260; Raymond v. Tyson, 17 How. 59–62; Potter's Dwar. St. 130, 136, 145. General stipulations, having a reasonable scope of application consistent with the purpose of the voyage, are not to be construed as authorizing what is incompatible with its purpose, or what would inflict extraordinary loss, for it is not credible that either party could have so intended. Thus, the stipulation authorizing vessels to

touch and stay, or to call, at any port or ports, and in any order, is limited to such as are upon the course of the voyage specified. Gairdner v. Senhouse, 3 Taunt. 16, 22; Solly v. Whitmore, 5 Barn. & Ald. 45; Leduc v. Ward, 20 Q. B. Div. 475; Steam-Ship Co. v. Theband, 35 Fed. Rep. 620, affirmed on appeal. In the case last cited, the same construction was applied to the clause in question, viz.: "To tow and assist vessels in all situations;" and that clause was held not to authorize a vessel to go 40 miles directly out of her course for the purpose of taking another vessel in tow in the ordinary course of towage.

A similar construction here must exclude any general departure from the purpose of the voyage; or any such procedure as must plainly subvert its purpose as respects the cargo. This clause was inserted to enable the ship to do a salvage service without thereby becoming an insurer of the cargo against all subsequent perils. But this privilege does not override all the other express and implied agreements and duties imposed by the bill of lading, or permit the subversion of the voyage. All the provisions of the bill of lading are to be construed together, and consistently with the general purpose of making the voyage effective and beneficial to both vessel and cargo. This clause would not authorize an abandonment of the voyage in mid ocean, or the throwing over of the cargo, in order to render a salvage service; for both would be incompatible with the purpose of the voyage. See The Colon, 10 Ben. 60, 76. But it is the same thing to the cargo owner whether his cargo is thrown overboard, or voluntarily delayed till it is decayed and worthless. The implied and paramount obligation of the ship as respects perishable cargo is to deliver it seasonably; and all minor stipulations are to be construed as subordinate to that, and limited to consistency with this main purpose, "ut res magis valeat quam pereat." Consulado, c. 214; 3 Black Book Adm. 465.

I have no doubt, therefore, that if the master, when he undertook this service for the Catalan, knew, or had reason to know, that the chilled beef in this case must necessarily suffer certain decay or deterioration from the delay caused by the salvage operations, he could not justify the delay by the clause giving him liberty to tow and assist vessels in all situations; and that the ship must, therefore, make compensation for the loss inflicted on the cargo by the salvage undertaking.

I am not satisfied, however, upon the evidence, that the master is fairly chargeable with this knowledge. He testifies unequivocally that he had no such knowledge, but supposed that the chilled beef would keep an indefinite time without injury, if the temperature were kept at 32°. No doubt suspicion reasonably attaches to testimony as to one's own knowledge, given to prevent being held for a large loss. But I do not find any facts or circumstances connected with this feature of the chilled beef business, brought home to the master, in a manner to warrant a disregard of his testimony. He made no inquiry at the time of the custodian in charge of the beef,

as he did not suspect any liability to loss; nor did the custodian make any objection to the salvage, though he, if any one, ought to have suspected a liability to special damage to his beef through the probable delay. And on the arrival and discharge of the cargo, no damage was reported, nor at that time perceived, or apparently expected by any one; and none was known to the libelant in the salvage suit at the time when the award therefor was made. The liability to damage was a matter of expert knowledge; but not, I think, of common knowledge. The salvage service being apparently authorized by the privilege clause in the bill of lading, and to be taken out of that clause by construction only, and in consequence of the special facts and the certainty of damage to the beef, as forming an exception to the general scope of the privilege, the master's knowledge of those facts must appear in order to sustain the exception. For lack of this, I must dismiss the libel, but without costs.

This libel not having been filed to recover salvage as such, I have not discussed that feature of the subject. The general circumstances of the case are stronger even than those in The Colon, 10 Ben. 60, in which Judge Choate allowed compensation as salvage to the cargo owner for his necessary loss. That decision upon its special facts seems to me sound and just, and the necessary result of the decisions in the prior cases. It is not inconsistent with the adjudications in The Persian Monarch, 23 Fed. Rep. 820; The Brixham, 54 Fed. Rep. 539, (Hughes, J., March 1, 1893;) and The Dupuy de Lome, 55 Fed. Rep. 93,—in which no special loss or special liability to loss existed, and which, therefore, were within the implied waiver of the salvage clause of the bill of lading; though I dissent from some of the general expressions used in the latter decisions.