## The Steamer Leipsic.

*(District Court, S. D. New York. November, 1880.)*

**1. Agreement at Sea for Towage—Construction—Salvage—Practice—Apportionment—Costs.**

Where the steamer L., on a voyage from Baltimore to Bremerhaven, with a general cargo and 12 passengers, broke her shaft when about two days out, but was otherwise sound, staunch, and strong, well equipped, manned, and provisioned, and able to proceed under sail with favorable winds, and seven days thereafter, September 13, 1879, being about 125 miles from Sandy Hook, was towed into New York by the freighting steamer G., which being then bound to Baltimore,

in ballast, to fulfil a charter requiring her to be there September 25th, deviated 40 miles in a direction opposite to her course, upon report of her condition, to find her, the vessels arriving safely in New York on September 14th, the towing service continuing about 24 hours, and the G. being detained in her arrival at Baltimore about 48 hours, and the two captains made a written agreement at sea for the payment of £3,-000 for the service, which contained, however, the following clause, "but leave it to the court to prove the said agreement," which clause was inserted because the captain of the L. would not otherwise sign it, after a discussion of the amount to be paid by the service, which was the only matter of difference between them, the L. and cargo being valued at $250,945, and her freight, if earned, being $13,757.37, and the G. being valued at $90,000:

*Held*, on the evidence, and as matter of construction of the agreement, that the parties clearly intended by the agreement to submit the question as to the amount of the compensation to the judgment or review of the court.

That the sum named in the agreement was greatly excessive.

*The Colon*, 4 FED. REP. 469, and other cases.

That such service, whether salvage or not, is to be compensated not upon the ordinary principles of a *quantum meruit*, but liberally and with a view to all the circumstances.

*The Emily B. Souder*, 15 Blatchf. 185.

That in this case the service was a salvage service.

*The Ellora*, 1 Lush. 550.

That $3,750 was a proper award—apportioned, three-fifths to the vessel, and of the remaining two-fifths, one-tenth to the master and nine-tenths to the crew, including the master, in proportion to their wages.

That where the libellants, owners of a vessel, sue in their own behalf, without joining the master and crew, who are entitled to share in the compensation, the proper practice is to determine the entire amount, and apportion it between vessel, master, and crew, and to have the share of the master and crew paid into the registry of the court to await their application therefor.

*The Adirondack*, 2 FED. REP. 872.

That the claimants, having made no tender before suit, should be charged with costs.

*Ullo, Reynand & Harris*, for libellants.

*Shipman, Barbour, Larocque & McFarland*, for claimants.

CHOATE, D. J. This is a suit brought by the owners of the British steamer Gresham to enforce against the German steamer Leipsic an agreement entered into by the masters of the two steamers, while at sea, on the thirteenth day of September, 1879. The agreement was as follows:

"LAT. 39, 30; LONG. 71, 25 m., Sept. 13, 1879.

"It is this day agreed between Capt. F. Pfeiffer, of the S. S. Leipsic, and Capt. Gibb, of the S. S. Gresham, to tow the said steamer Leipsic to Sandy Hook for the sum of three thousand pounds, (£3,000,) but leave it to the court to prove the said agreement.

[Signed]                            "F. PFEIFFER.
                                    "THOS. GIBB."

The Leipsic was a steam-propeller, of about 2,000 tons burthen. She was one of a line of steamers running between Baltimore and Bremerhaven. She left Baltimore on the fourth of September, 1879, passing Cape Henry on September 5th at 4:45 A. M. On the sixth of September that part of her shaft known as the "first transmission shaft" broke. By this accident she was disabled as to her machinery. She was then about 350 miles from New York, which was the nearest port. Her propeller was then disconnected, and she proceeded under sail towards New York, heading about W. N. W. By September 12th, at noon, she had reached a point about 125 miles from Sandy Hook. From that time till noon of the 13th, when the Gresham took her in tow, there was almost no wind, and she made no headway, but drifted about 20 miles in a north-easterly direction. One day she made, under sail, 50 miles, and other days less than this, down to 10 miles. She was in all respects, except as to the injury to her machinery, staunch and strong, well-manned, equipped, and provisioned. She had on board a general cargo of merchandise and 12 passengers. On the afternoon of the ninth of September she was spoken by the British steamer Gamelot, which offered assistance, but it was declined. When it became calm on the 12th her master determined to call for assistance, if opportunity offered, and he ordered rocket signals to be given on the night of the 12th in case a steamer passed. About noon of the 12th she had spoken a bark bound for the Delaware breakwater, and asked her to report the steamer as being there with a broken shaft. About 3 o'clock in the morning of the 13th a steamer bound to the westward, which it appears probable was the Gresham, passed the Leipsic

within five or six miles, but took no notice of or did not understand her rocket signals. About 8 or 9 o'clock in the morning the Gresham overtook the bark, and was informed by her that there was a steamer to the eastward with a broken shaft, giving her supposed latitude and longitude. The Gresham was immediately put about and proceeded in the direction indicated, which was nearly opposite to her own course, and about 2 o'clock, after steaming about 40 miles, she sighted the Leipsic. The Gresham was bound from Newport, England, to Baltimore in ballast. The master of the Gresham asked the master of the Leipsic if he wanted a tow, to which the master of the Leipsic replied that he did. The master of the Gresham went on board the Leipsic between 3 and 4 o'clock, and the two captains had a conversation, the result of which was that the agreement sued on was signed. They differed as to the amount to be paid, the master of the Gresham at first demanding a much larger sum than £3,000. He testified that he first demanded £4,000. The other captain understood him to demand £6,000. Finally the agreement was made and signed as given above. The words, "but leave it to the court to prove the said agreement," were added before it was signed. The master of the Leipsic refused to make the agreement except upon that condition, because he thought the sum named too high. He is a German, but spoke English, and the conversation was in English. The master of the Leipsic asked to be towed to New York, stating that he would make his repairs there. The master of the Gresham told him it would be out of his course, but that he would tow him either to the Delaware breakwater or to New York, and the latter was agreed on. The weather was good and the sea smooth. The wind was at that time very light und unfavorable for the Leipsic proceeding under sail. The Gresham took her in tow by two hawsers furnished by the Leipsic. They got under way, soon after the agreement was signed, on the afternoon of the 13th, and passed Sandy Hook about 3 o'clock on the afternoon of the 14th, and proceeded about six miles up the bay, where the hawsers of the Leipsic were transferred to a tug, which towed her to Hoboken. The

Gresham waited here for some trifling repairs to her machinery, and then, on the 14th, proceeded to Baltimore. She arrived at the mouth of the Chesapeake bay early in the morning of the 16th. She had calculated to arrive there on the morning of the 14th. She was a freighting steamer, of 1,092 tons register. She was under charter to proceed to Baltimore, and there take on board a cargo of grain for a port of delivery in Great Britain or Ireland, or on the continent between Bordeaux and Hamburg, inclusive, but excluding Rouen, according to orders to be given on signing bills of lading. By the charter she was required to be at Baltimore by the twenty-fifth of September. The stipulated freight under this charter would amount to $12,000. The agreed value of the Leipsic is $90,000; that of her cargo, $160,945. The amount of her freight on that voyage, if earned, would be $13,757.37. The value of the Gresham is $90,000, and the amount of her freight earned on her outward voyage from Baltimore was £2,839 10s. 6d. The towage service was rendered without accident. It was not attended with any special difficulty or danger. The weather was at first fair, and soon after they started the wind became fresher and both vessels set all sail, and then they made for a time about seven knots. On the night of the 14th it became rainy and squally, and the wind getting round to the south-west they proceeded under steam alone. The evidence does not show that the Gresham sustained any damage in her machinery in consequence of the towage.

I think it is entirely clear that the agreement between the vessels was made subject to the approval of the court as to the amount therein named (£3,000) as the amount to be paid for the towage service. The use of the word "prove" is perhaps to be attributed to the fact that one of the parties to the agreement was a German. At any rate, I cannot imagine any other meaning intended by the words, "leave it to the court to prove the said agreement," than this. The only point upon which in the negotiation the two captains had any disagreement was as to the amount to be paid; and it is clear that this was the matter to be left to the court. It is

also clear that the amount suggested by the agreement is very greatly in excess of the amount which the court would award for the same service. *The Adirondack*, 2 Fed. Rep. 387, and cases cited; *The Saragossa*, 1 Ben. 551; *The Colon*, 4 Fed. Rep. 469; *The Ellora*, 1 Lush. 550. The libel in this case does not allege that the service rendered was a salvage service; but whether a service of this nature is, under the peculiar circumstances of the case, to be considered as technically salvage, or only as an extraordinary towage service, it is to be compensated, not upon the ordinary principle of a *quantum meruit*, but liberally and with a view to all the circumstances. *The Emily B. Souder*, 15 Blatchf. 191. In this case, I think, under the circumstances, it was a salvage service. *The Ellora, supra.* The Leipsic was not in distress, other than that which was occasioned by the disabling of her steam motive power. She could be navigated under sail, and was in a position from which she could reasonably be expected to reach port in four or five days, with favorable winds, or at any rate to reach a position where she could certainly obtain assistance to tow her into port, and she was not out of the ordinary track of vessels going to and from New York. Her principal motive for asking assistance was the saving of time she would make by reaching port without further delay. It does not appear that her cargo was perishable or liable to deterioration. The Gresham went out of her way some 40 miles to find the Leipsic. She also deviated from her voyage to Baltimore, and came to New York to render this service. Her arrival in Baltimore appears to have been delayed about 48 hours, yet as she had till the twenty-fifth of September to report herself there, she ran very little or no risk of losing the benefit of her charter by the performance of this service, and did not in fact suffer any loss of employment by reason of the delay. Her service was, however, highly meritorious and beneficial to the Leipsic. Under all the circumstances of the case I think the sum of $3,750 a fair compensation.

These libellants, the owners of the Gresham, sue only on their own behalf. They have not joined the master and crew of the vessel as libellants, nor do they sue in their behalf; yet

in all such cases the master and crew are entitled to share in the compensation. I think the proper practice is to determine the amount to be awarded as the entire compensation, and to apportion it as between the vessel, master, and crew; and that portion awarded to master and crew will be paid into the registry to await their application for it. *The Adirondack*, 2 FED. REP. 872.

Of the sum so awarded three-fifths will go to the owners of the steamer, and two-fifths to her master and crew—the master receiving one-tenth of the two-fifths, and the officers and crew, including the master, the remainder in proportion to the respective rates of their wages.

As the claimants have made no tender they will be charged ith the costs.

Decrees accordingly.