Hughes, District Judge.
First. As to the Brixham. It seems plain that the evidence of witnesses of the Chatfield taken in this case is disproved on all contested points. The direction of the wind when she was approached and taken in tow by the Brixham was N. N. W., and remained so, or nearly so, all through the day and night of the 27th. That is conceded. But the wind was not a mere fresh breeze of 6 to 14 miles an hour, as stated, and iterated by master and mates. All the other witnesses sa'y otherwise, and the signal service record of the wind at Cape Henry contradicts their testimony, and corroborates, with singular completeness, the testimony of Sheldrake, master of the Brixham. In fact, from 11 o’clock, the time the towing began, till midnight of the 27th, the wind was blowing a gale. All the witnesses of the Brixham concur substantially in saying so, and all the circumstances of the occasion corroborate their statements. If the sea and wind were “nothing at all,” as one of the Chatfield’s witnesses testifies, when the two ships came first into proximity, why did not the Chatfield lower a boat, and enter quietly into a settlement of the terms of the towing? Why did the two vessels stand off at cautious distances, and communicate solely by means of dumb signals ? The weight of evidence proves that, after being taken in tow by the Brixham, the Chatfield took in her sails; butif, as McFee states, they were spread, how could a mere fresh breeze split the new sails of a new ship in pieces ? And of what avail could sails have been at all to a ship moving within three points of the wind? The Chatfield, showing a surface 17 feet above water, was indeed a great mark for the wind, but would have been easily steadied by her own rudder and by the two hawsers of the Brixham, moving 3 miles an hour over tlje water, if the wind had been only a 6 to 14 mile breeze. The fact that she sheered beyond •control of so stout a tug as the Brixham is conclusive of the fact that she was breasting a gale; otherwise, why did the strong hawsers by which she was drawn part, and continue to part, while she was under tow? And, as to soundings before the Chatfield was taken in tow, no one took or reported them but Logan, the second mate,—the man who testified that the night of the 27th was a bright, starlight’ night, and that there was no sea, and only a fresh breeze, during a period when the official report shows that the wind was blowing a gale. It is hard to believe that a witness who is discredited 'on every other point on which he testifies spoke truly as to the soundings. Burn, the other Chatfield mate, says, arguendo, that there could have been no sea, because the wind was off *490 shore,—a reason which would probably have been conclusive if his ship had been a small distance off shore, but is of no validity as to a ship 50 to 75 miles out to sea.
No one of the three witnesses of the Chatfield pretends that she let go her anchors in the interim between losing her propeller, at 11 on the night of the 26th,and sighting the-Brixham, in the forenoon of the 27th McFee, her master, says, there being no wind, he let his sails lie, and waited till next morning. Certainly, without sails and without wind, it would have been necessary for the ship to let go her anchors if the bottom could be reached. That they were not let down is proof that the ship was out at sea, beyond reach of the line of 30 fathoms. McFee’s statement, however, that there was no wind, and that he let his sails lie, is not credible. The weight of testimony is conclusive that there was a high wind all the- night of the 26th, and the signal service record of the velocity at Cape Henry confirms the preponderant testimony. It is impossible' to believe but that there was a strong wind on the night of the 26th, and that the Chatfield’s sails were all set. McFee subjects rational belief to too great a strain when he affirms that during all the night of the 26th, after 11 o’clock, he made no use of his Sails; and yet that when he was in tow of the Brixham next day, moving within three points of the wind, he had them set before a wind that split them. It is just as incredible that, when sighted on the 27th by the Brixham, the Chatfield was at the point “B” which he marks on the chart. The mathematics of the case renders this statement very wide of the fact. The Brixham set out from Philadelphia at 10:30 A. M. on the 26th, moving at her usual speed of about 9 miles an hour. _ The distance to the capes is 96 statute or 81 nautical miles, and the distance on to Fen-wick Island light 25 nautical miles further,—or about 106 miles from Philadelphia. If we allow that the favorable wind on her stern helped her engines a quarter to half a mile an hour, she was abreast of Fenwick Island light in 111-hours from the time of leaving Philadelphia, or at 9:45 p. m., as stated by her log. From this light she took and continued on a course due south till about 9:45 next day, a period of about 12 hours; the longitude of her course being about 74° 42'. The-speed of her engines was 9 knots an hour; some of her crew stating it to be 8i to 9, and some 9 to 10. The current of the ocean was-more than a mile in her favor, and there was a strong wind behind her, helping her engines. It is therefore just to infer that she made 10’ miles an hour, which, by 9:45 o’clock on the morning of the 27th, would have brought her a distance of 120 miles, or 2 degrees of latitude, from Fenwick Island light, which is in latitude 38° 27', and placed her at that hour in latitude 36° 27', longitude 74° 42'; that is to say, would have placed her at the letter “X” on the chart, marked by Sheldrake. If the Chatfield was then at MeFee’s point “ B,” marked by him on the chart, she would have been 30 miles away from the Brixham, and out of sight. McFee and his mates say that they first sighted the Brixham at about 11 o’clock, or after, and were not under tow till 1 o’clock. The first of these statements cannot be true, and the second must fall with *491 it. If the Brixham had gone on her course for an hour and a quarter longer than her own crew testifies, and as the Chatfield’s officers insist, before she sighted the Chatfield, then she had got 132 miles south from Fenwick Island light, or to latitude 36° 15', and would have been 42 miles from point “B,” where McFee claims that the Chatfield was. To insist that the Brixham was not sighted till 11 o’clock on the 27th is to present a case mathematically impossible. The point “B” cannot be accepted as the position of the Chatfield at either 9:45 or 11 o’clock on the 27th. At the earlier hour, she was within a few miles of the point marked “X,”—say five miles west; and it was from that point that she was towed by the Brixham. The wind was within about three points of being dead ahead during the towing, and the sails of the Chatfield, even if hoisted, could have been of no avail. The great weight of the Chatfield, and the large surface which she presented to the wind during the towing, caused the sheering of which both crews complain—each of the other—so much in the testimony. The steering was not at fault. The sheering was the result of the vis major of the gale. Against a gale of wind on her starboard quarter, the Chatfield’s own rudder and the taut hawsers of the Brixham were unable to steady the great ship. She sheered continually, and put so great a strain upon the hawsers that, under the vigorous towing of the Brixham, they parted, one after the other. In face of the gale, the larger ship seriously interfered with the steady course of the tug, veering it from side to side, and presenting the spectacle, described by the Brixham’s first mate, of the towed vessel taking charge of the tug; or, in other words, realizing the idea expressed by the popular paradox of the tail wagging the dog.
Despite of this embarrassing state of things, the Brixham persisted stoutly in her work, moving 3 miles an hour, making a distance of 28 miles, on a course about W. N. W., between 10:45 in the morning and 7:45 in the evening; towing the Chatfield from a point a few miles west of point “X” to one marked “Y” by Sheldrake on the chart. At that time the wind had nearly reached its highest velocity, and, the hawsers having broken three times, it was a proper determination of the Chat-field, acquiesced in by the Brixham, to come to anchor. When the Chatfield let go her anchors, the wind was blowing a gale of 47 miles an hour, which was too strong to admit the towing of a large ship 17 feet out of water, weighing 4,000 tons, by a tug low in the water, and of only a fifth her size and avoirdupois, especially by night. The chart shows the movements of the two ships before and during the towing. The Chatfield had moved—whether by drifting or under sail was not definitely shown—from a point, “A,” 53 miles E. half N. from Cape Henry, between 11 o’clock on the night of the 26th to 10 o’clock on the morning of the 27th, to a point a few miles from the place marked “X,” which is 72 miles E. S. E. from Cape Henry, where there were no soundings. There she was taken in tow by the Brixham. She was thence towed, in the face of a gale of wind, and against a current of the ocean setting south, with great labor and difficulty, but with considerable courage and resolution, by the Brixham, on a course W. N. W., *492 to the point “Y,” where there were soundings of 17 fathoms, and where, in the height of the gale, she anchored for the night. She was attended there all the boisterous night of the 27th by the smaller vessel, and was still safe in the morning, but had probably dragged her anchor for six or seven miles southeasterly, to a point marked “ C ” on the chart. At 8 o’clock, the City of Augusta having been sighted in the offing, the Chat-field directed the Brixham to proceed into port, to obtain the assistance of another tug; her master’s object being, in sending her on this mission, to get the Brixham out of the way, in order that the approaching vessel might not be deterred from answering his signals of distress, soon afterwards hoisted, by the presence of the first salving vessel. This proceeding of her mast® would seem to show that he felt himself so much in danger as to desire to provide two chances of rescue, at, the expense of resorting to a subterfuge in dealing with a salvor who had saved him from the dangers of the gale of the preceding day and night, during which he had moved or drifted some 40 miles from the place where he had lost his propeller. The danger of the Chatfield, from which she was rescued by the Brixham, consisted in her being far out at sea, beyond 80 fathoms soundings, without power of locomotion except four small sails, wholly inadequate for so large a vessel, so heavily loaded, and drifting upon a very strong current, setting southward, and before a wind blowing, for the 10 hours anterior to her being sighted by the Brixham, at the rate of 20 to 40 miles an hour, on a coast proverbially dangerous in the pendency of heavy winds. That a strong current does set to the south oh this coast is abundantly known to all mariners, and is in the judicial cognizance of the court. While this case is under consideration, the three-masted schooner Freddie Heniken broke from her anchors off Lynnhaven bay, was borne by the current out to sea through the capes of Virginia, in the face of a northeastern storm of wind, and carried south by the current, until she went ashore' at Gull Shoal light station, 18 miles short of Hatteras. It was on this current and on this coast that the Chatfield drifted on the night of the 26th of October, from point “A,” marked on the chart, for about 40 miles, to a place a few miles westward of point “X,” marked on the chart. If the three officers of the Chatfield were sincere in their testimony, then their vessel was in the additional danger of being in control of mariners who were in unconscious ignorance of the situation of their vessel, believing her safe when she was in circumstances of extreme danger. The service rendered by the Brixham consisted in suspending her voyage when moving before a favorable wdnd and current, and coming to the assistance of the vessel in distress in a wind and sea which rendered the attempt very difficult and dangerous; in taking hold of that vessel, thus drifting, in a gale on a heavy sea, and not only holding her safe during the worst of the gale for 9 hours, but in towing her some 28 miles towards port, from a position 70 miles out at sea, where there were no soundings, to within 43 miles of Cape Henry, to a place where there were only 17 fathoms of water, and where she was able to anchor safely, watching her there during the night. The probabilities are great that *493 on the next morning the Brixham could have taken the disabled ship into harbor under a wind diminishing all day gradually from 35 miles an hour in the morning; and it is certain she was desirous to undertake the enterprise, and would have done so, but for being sent by the Chatfield’s master for another tug. Obedience to this instruction does not impair the Brixham’s right to 'salvage in this case, as there was no intention on her part to abandon the enterprise,—a fact which was shown by her prompt return, in company with another tug, to resume the towing of the Chatfield at the place where she was left in the morning.
Second. As to the City of Augusta. Coming now to the claims of the City of Augusta, it is to be remembered that her service was none the less meritorious from the fact that the Chatfield had still a chance of being«taken safely into port by the vessel which had first had her in tow. The flying of signals of distress on sighting the Augusta estops the Chat-field from such a pretension. What, then, was the danger of the Chat-field at 9 o’clock on the morning of the 28th, when the Augusta, responding to urgent signals, came to her relief? She was drifting, with dragging anchor, from the point marked “Y” on the chart, where she had been at 8 o’clock on the night before, and had made seven or eight miles southeasterly, to point “C,” when she was taken in tow by the Augusta. The state of the wind and sea made the attempt of the Augusta to get lines from her very hazardous. The unmanageable condition of the Chatfield, pitching and sheering heavily upon a dragging anchor, made it dangerous for the other vessel to approach near enough to pass lines for the hawsers. In this attempt there was’ an actual collision. But the great risk to the Augusta after getting hold of a hawser was in fouling her propeller with it,—a danger which would in all likelihood have been disastrous to both ships.
It is useless here to go into the details of the evidence on these points. The signal service report of the velocity of the wind at Cape Henry on the morning of the 28th is in singular coincidence with the testimony of Catharine, master of the Augusta, and discredits that of the three Chatfield officers. Contrary to the statement of these latter, the wind and sea were so bad that it was impracticable to pass lines between the two ships by casting them with the hand; several attempts to.do so having failed. A line was not successfully passed until a buoy was used to float it from the Augusta, when it was taken up by the Chatfield with grappling hooks. An ordinary ship’s boat could not have been used for the purpose, and could not have lived in such a wind and sea. The Chatfield officers’ asseverations to the contrary are not credible. The Chatfield was dragging her anchor slowly and surely, by force of a current which would have landed her in time on that graveyard of so many ships,—the coast stretching from out where she was to Hatteras. It was not shown that any other steamer passed -in the usual track of steamers off that coast on that day, and the only chance of the Chatfield for rescue from her peril, except from the Augusta, was in the return of the Brixham, upon which she had practiced a ruse. The service of the Augusta consisted in her having rescued the Chatfield from a sim *494 ilar, though not so great, danger as that from which she had been rescued by the Brixham the day before.
As to the amount to he awarded. In determining the amount of salvage which ought to be awarded to the Brixham and to the Augusta in these cases, I cannot consent to be restricted by the awards of the admiralty courts of New York city in salvage cases. The dry-land court rule of quantum meruit, so long controlling in those decisions, under the powerful influence of great and wealthy insurance companies located in that city, who are the real litigants in salvage cases, has proved to be inadequate to the requirements of the salvage service. The New York decisions discourage, rather than encourage, salvage daring and enterprise. To give, besides what is earned, an award for successful risk and daring, is of the essence of salvage service. The great ocean steamers, which are the most efficient salvors of vessels in distress, are unwilling to deviate from their scheduled courses, and to encounter the risks of difficult and hazardous salvage enterprises, for the lean compensation so generally awarded by the New York courts; often after dilatory litigation, further protracted by the delay of appeals. On the coast between Cape Henry and Charleston the difficulty and danger of salvage services are exceptionally great, requiring more liberal awards for those which prove successful than services rendered in other and safer waters, on ■other and safer coasts. I feel doubly warranted, therefore, in pursuing ■a more liberal policy in awards for salvage than the New York precedents are held to justify. Still it must be conceded that the cases now under consideration cannot be classed as of the highest grade of merit. It is shown in the evidence that the actual cost to each of the vessels filing the libels under consideration, due chiefly to collisions which they had with the saved ship in the act of rescuing her, has been in the neighborhood of $5,000. It is with a general reference to this fact that I will estimate the amounts awarded in these cases. The whole value •saved was about $485 ,000. The whole put at hazard in the case of the Brixham was about $80,000, and in that of the City of Augusta about $440,000. I will sign a decree in favor of the Brixham for $12,500, .and in favor of the City of Augusta for the sum of $15,000. These amounts are intended to cover and include all claims of the respective vessels for the amounts reported by the commissioner as actual damages and expenses.
NOTE. There was no appeal from the foregoing decision, and the amounts awarded were paid as decreed by the court.
Against part of the award in favor of the Brixham, a petition was filed by the Merritt Wrecking Company, and elaborate evidence taken in respect to the claim set up by the petition. The decision of the district court on the case presented by the petition follows.