Morrow, District Judge.
The steamer Wellington, on a voyage from. Departure Bay, British Columbia, to San Francisco, with a cargo of coal, broke her shaft, and was taken in tow by the Norwegian steamer- *606 Marie. After a time the hawsers with which the Wellington had been made fast to the Marie parted, and, as the latter vessel was in ballast, it was found extremely difficult, in the heavy seaway prevailing, to pass other and additional hawsers for the purpose of again taking the Wellington in tow. The effort was accordingly abandoned, and the Marie proceeded on her voyage. When the accident occurred to the Wellington is not disclosed by the pleadings or the testimony in the case, nor does it appear when she was taken in tow by the Marie, or how long she remained in tow of that vessel. The case before the court relates to events that occurred a day or two later, when the steamer San Pedro, on a voyage from San Francisco to Tacoma, sighted the steamer Wellington, about 90 miles south of Cape Flattery, at 1 o’clock and 20 minutes on the afternoon of November 3,1891. A southeast gale was blowing at the time, and occasionally heavy rain squalls obscured the Wellington from the view of those on board the San Pedro. It was observed, however, that the Wellington was hove to, and, upon the San Pedro approaching nearer to her, it was discovered that she had her ensign flying union down. The Wellington was disabled, and lying in the trough of the sea, in practically a helpless condition, with the waves breaking over her. She signaled to the San Pedro to.be taken in tow. The latter vessel approached the Wellington very slowly, coming up under her stern, to get a heaving line from the Wellington to the San Pedro. This was accomplished after some effort, and, after the end of the heaving line had been passed forward on the Wellington, it was bent onto a four-inch steel hawser, which was hauled on board the San Pedro by a steam winch. This steel hawser was bent onto the end of a chain cable on the Wellington. The San Pedro then started ahead slowly, but as soon as the strain of the tow came on the steel hawser it parted at or near the Wellington, and the main part was hauled on board the San Pedro. The master of the Wellington immediately signaled, “Don’t abandon me,” whereupon the master of the San Pedro backed his vessel, stern foremost, up to the windward of the Wellington, for the purpose of making another effort to take her in tow. In the mean time the crew of the San Pedro got up a new 14-inch Manilla hawser, which was bent onto the steel hawser, and the other end of the Manilla hawser taken on board the Wellington, and made fast. It was then about 4 o’clock. The work of securing the Wellington, which has been briefly described, had occupied about two hours. During that time the sea was rough, and the situation one of imminent danger to both vessels. The master of the San Pedro displayed courage and skill in handling his vessel, and the crew, under his direction, acted promptly and energetically. The master received some personal injuries, and it is claimed also that Robertson and Johnson, of the crew, were hurt while handling one of the hawsers, but the character or extent of these injuries has not been clearly established. The Wellington, being secured by a sufficient hawser, was towed by the San Pedro to Royal Roads, a distance of about 150 miles, where the two vessels arrived about 4 o’clock on the follow *607 ing day. The gale prevailed during the night. The Wellington had ■on board about 2,000 tons of coal, and steered badly. She sheered first to one quarter and then to the other. Her steering gear was out of order, •and when she was anchored at Royal Roads it was discovered that she had a slight list to starboard.
Capt. Hewitt, the master of the San Pedro, testified that the Wellington was about 20 miles from land, and drifting to the north, when he took her in tow, and it was his opinion that, if he had not rendered her that assistance, she would have foundered during the night. There is no controversy as to the character of the service rendered the Wellington by the San Pedro. It is admitted that it was a salvage service. The -question is as to the award to be made in favor of the master and crew of the San Pedro. The owners of the latter vessel have settled their claim with the owner of the Wellington for $10,000, but the master and crew of the San Pedro have not been compensated for their services. The value of the Wellington was about $100,000. Her cargo of coal was discharged before the libels were filed, and cannot, therefore, be considered in making the award. The reference that is made to the failure of the steamer Marie to tow the Wellington indicates that the principal difficulty in that effort was in the lack of a sufficient towline. The Wellington was certainly deficient in this particular, and such was probably the condition of the Marie, while the San Pedro had a large, pew hawser, suitable for towing purposes. The Wellington was undoubtedly in a critical condition, and in danger of being lost. She carried fore and aft sails, but they were not sufficient to put her in steerage way, or even get her out of the trough of the sea. Her rescue must be attributed largely to the power and equipment of the San Pedro, under the direction of a skillful master. The San Pedro was a powerful vessel of 3,000 tons register, valued at $350,000.
It is claimed on behalf of libelants that the salvage award should be at least one third of the value of the Wellington, and that the master and crew of the San Pedro should be allowed the difference between that sum and $10,000, the amount already paid to the owners of the San Pedro. This method of calculation would result in an award to the libelants of about $23,000. The claimant contends, on the other hand, that, while the libelants are entitled to some compensation, the services rendered, taken in connection with the other circumstances in the case, ■do not call for any such allowance. Numerous cases are cited on both •sides, showing a wide range in the judgments of the courts in making such awards, but no uniform rule has been found, directing the court to .an absolutely certain and satisfactory result in every case.
The salvage service rendered by the Zambesi to the Charles Wetmore near the mouth of the Columbia river in December, 1891, (51 Fed. Rep. 449,) was, in some respects, similar to the services rendered in this -case. The situation of the Wetmore was apparently quite as serious as that of the Wellington. The Wetmore had been disabled by the loss of her rudder plates. An attempt to rig a drag or jury rudder composed *608 of a lot of rope and chains had failed to he of any use. The vessel could not be steered. She was in about six or seven fathoms of water, and was drifting slowly but surely towards the shore, only four or five miles distant, when, after considerable effort, she was taken in tow by the Zambesi. The Wetmore and her cargo were valued at $409,219.09. The Zambesi was valued at $220,000. The court allowed a salvage compensation of $20,000,—a little less than 5 per centum of the value of the Wetmore and her.cargo,—and distributed this award as follows: To the crew, $5,000; to the master, $5,000; to the mate, $1,000; to the pilot, $2,000; and to the owners of the Zambesi, $7,000. The master and crew were allowed one half of the total salvage compensation, or less than 2& per centum of the value of the salved property, but this percentum allowance would not, of course, produce the same result in the case at bar, since the Wellington is only valued, as before stated, at $100,000. Manifestly, a proper allowance, where the value ofthe salved property is small, would he a larger per centum for like services than where the value of the property is much greater. Then, again, the proportion of the allowance to the master and crew, as compared to the whole award, does not necessarily furnish a sufficient standard of compensation. The skill and services of the master, the labor of the crew, the risk to the salving steamer, and its value, are all elements to be considered according to their degree. In the present case, the San Pedro was valued at $350,000, while the Zambesi, in the case cited, was valued at $220,000. It requires no argument to show that, in the risk of these two vessels in a salvage service, the San Pedro would be entitled to a larger compensation than the Zambesi, and a larger proportion as compared with the allowance made to the master and crew. It follows from these considerations that each case should be determined by the weight and value of all the attending circumstances, and this appears to be about the only general rule sanctioned by authority for the exercise of the judicial discretion. I will, therefore, in view of all the circumstances attending this case, allow the master of the San Pedro the sum of $2,500, and to the members of the crew who have been made parties to the pending libel $100 each. A decree will be entered accordingly.