## THE ELM BRANCH.

(District Court, D. Washington, N. D. February 21, 1901.)

1. SALVAGE—AMOUNT OF COMPENSATION—RULE FOR DETERMINING.

The admiralty law does not contain any scale by which to determine on a percentage basis the amount earned by salvors, but the rule should be to award such a sum as will give a moderately liberal compensation for the services rendered, considering the merit of the service, the value of the property saved, and all the other facts and circumstances appearing in the particular case.

2. SAME—RESCUE OF DISABLED STEAMSHIP—AMOUNT OF AWARD.

A steamship worth $150,000, and carrying a crew of 33 men, broke her shaft, and lost her propeller, when 197 miles off the Oregon coast. Stormy weather came on, and she was unable to make repairs, or to make a port of safety with the sails she carried. She drifted in the direction of Cape Flattery four days, when she came in sight of a lightship, and subsequently anchored in 30 fathoms of water. Two passing vessels to which she signaled attempted to take her in tow, but failed, owing to the parting of the lines and the heavy sea. Subsequently, libelant's tug, a powerful and well-equipped vessel, came to her assistance, and by the prompt and skillful action of the master and crew of the tug she was towed to a port of safety, without injury, arriving the following morning. The service was attended by considerable peril owing to the severity of the storm, which also continued with increasing severity for some days thereafter; and the evidence tended to show that, if the ship had not been rescued that day, she would probably have been lost. On such facts an award for salvage was made, apportioned among the owners, officers, and crew of the tug, amounting in all to $8,175.[1]

In Admiralty. Suit to recover salvage.

Struve, Allen, Hughes & McMicken, for libelant.

Gorham & Gorham, for claimant.

HANFORD, District Judge. It is not disputed that salvage was earned, and the only controversy to be settled is with respect to the amount which should be awarded. The libelant's evidence includes testimony relating to matters not put in issue by the pleadings, and, as the libel has not been amended, all that evidence will be treated as foreign to the case. The British steamship Elm Branch, on a voyage into the Columbia river, carrying water ballast and 410 tons of coal, and having on board 33 persons, constituting her officers and crew, on January 8, 1900, broke her shaft, and lost her propeller. At the time of the accident she was off the coast of Oregon, 197 miles due west of Tillamook lighthouse. Preparations were made as soon as practicable to place in position an extra shaft and propeller, which the ship carried for such an emergency, but, bad weather setting in, it became impossible to extricate the ship from her predicament by that means, and she drifted in the direction of Cape Flattery until the morning of January 12th, when she came in sight of Umatilla lightship. Such sails as the ship carried were useful in holding her on a course to avoid the more dangerous coast north of the Straits of Juan de Fuca, but there was very little ground

[1] Salvage awards, see note to The Lamington, 30 C. C. A. 280.

for hope that the ship could make a port of safety unassisted. Before daylight on the morning of the 12th, the lights of the ship Elihu Thompson, bound south with a cargo of coal, were seen, and she was called to the relief of the disabled ship by signals of distress. When she came in speaking distance, Capt. Iliff, master of the Elm Branch, requested the captain of the Thompson to tow his vessel to Victoria. At that time the wind was blowing a moderate gale, the sea was quite rough, and both vessels were drifting. A towline consisting of a 7-inch Manilla hawser attached to a steel wire hawser was passed from the Elm Branch to the Thompson, but before the line could be adjusted, the Manilla hawser parted in the bend to which the steel hawser was coupled. Whether this was due to want of skill in coupling the two lines together, or a defect in the Manilla hawser, or by mere force of the waves, cannot be determined from the evidence. The captain of the Thompson declined to make a second attempt to take the Elm Branch in tow, but offered to go back to Neah Bay, and secure a tug to relieve her, and this offer Capt. Iliff accepted, and the Thompson went away on that mission, and the Elm Branch anchored in 30 fathoms of water. Within half an hour afterwards the steamship Washtenaw came along, and by request of Capt. Iliff attempted to take the Elm Branch in tow. With the Elm Branch at anchor and the Washtenaw drifting a small line was passed from the Washtenaw, but it parted before the towline to which it was attached could be hauled from one vessel to the other. Before making another attempt, the Washtenaw took a convenient position, and anchored, and the two vessels remained at anchor near each other until after the arrival of the libelant's tug Tyee. On the morning of that day the Tyee was in the Straits of Juan de Fuca towing a ship outward, but, owing to the storm then prevailing, it was considered unsafe to pass out of the straits, and the Tyee took her tow to an anchorage in Clallam Bay, where they arrived about 10 o'clock a. m. Capt. Bailey, master of the Tyee, went ashore there, and received a telephone message from Neah Bay, informing him of the situation of the Elm Branch, and he at once proceeded with the tug to the rescue. Passing Neah Bay he communicated with the steamship Elihu Thompson, and received definite information as to the position of the Elm Branch, and he went directly to her, arriving between 1 and 2 o'clock p. m., and finding the vessels at anchor as above described. His offer of assistance was at first declined by Capt. Iliff, because the Washtenaw had not then abandoned her effort. Capt. Bailey waited, however, and witnessed the second attempt of the Washtenaw to pick up the Elm Branch. A towline was passed from the former vessel to the latter, but before it could be adjusted, and while both vessels were at anchor, and no strain upon it other than the force of the sea, it parted. Capt. Iliff then hailed Capt. Bailey, and requested him to tow the Elm Branch to Victoria, and, upon a refusal of that request, asked to be towed to any place of safety, and in compliance with the last request the Tyee's towline was quickly coupled to the Elm Branch's port anchor chain, and as soon as the latter vessel's anchor could be

lifted the Tyee executed a maneuver which was somewhat dangerous, but necessary on account of the Washtenaw being in her way, by which she pulled the Elm Branch around on the proper course to pass Cape Flattery, and then started ahead, and towed the Elm Branch to Port Townsend, where they arrived about 6 o'clock the next morning. The Elm Branch and the Washtenaw each launched a boat, and they were manned and used in the several attempts to pass lines from one vessel to the other, but the gale and the high rolling waves made it impossible to take them on board again, and both boats were lost.

The success of this effort to save a disabled ship intact, with all on board, is to be credited very largely to the power of the Tyee, and her capacity to handle a heavy tow in a rough sea, and the completeness of her equipments for that kind of work. The service, however, was performed promptly and skillfully, and it required courage of a high degree on the part of Capt. Bailey and his crew to go to the rescue of a disabled vessel in the situation of the Elm Branch in a storm of such severity that it was deemed imprudent to go out to sea with a ship in tow. The stormy weather which characterized the morning of January 12th continued throughout that day, and for several days afterwards, and increased to such violence that it required two anchors to hold the Elm Branch in Port Townsend Harbor. Notwithstanding these uncontroverted facts, the answer of the claimant in this case denies that the Elm Branch was exposed to any considerable peril, and attempts to minimize the merit of the salvage service. In his testimony, Capt. Iliff states the facts with commendable candor, and yet he appears to have had vastly greater confidence in his ability to take care of himself and his ship without help, after his arrival in port, than he manifested when he made signals of distress to call a passing ship to his assistance, and when he accepted the offer of assistance from the Washtenaw at a time when he knew that another vessel had gone to Neah Bay to summon other help. Capt. Hastorf, the officer in charge of Umatilla lightship, and who was at his post during the storm referred to, and who has had many years' experience as a navigator, and who had the peculiar experience of losing a fine ship in a similar storm in the immediate vicinity of where the Elm Branch was anchored, testified as a witness in this case, and expressed the opinion that the Elm Branch could not have been saved if she had not been rescued that night. He explained that the bottom is sandy, and not the best holding ground for an anchor; and he expressed the belief that, if the ship's anchors held, the anchor chains would have broken; and, considering the actual happenings above narrated, I consider that the witness had reasonable grounds for the belief which he expressed. This is a parallel case to The City of Puebla (D. C.) 79 Fed. 982, and in the argument counsel for the claimant relies upon that case as setting a precedent for an award of less than 5 per cent. of the value of the ship and cargo saved; and it is insisted that, as the perils encountered by the salvors in that case were somewhat greater, and the time actually consumed in securing the disabled vessel and towing

her to Port Townsend was 14 or 15 hours longer than the time consumed in going to the relief of the Elm Branch and towing her to the same port, and as the number of lives on board the Puebla was much larger than the number on board the Elm Branch, the percentage in this case should be less, rather than greater, than the percentage allowed as salvage in the Puebla Case. The admiralty law does not contain any scale by which to determine on a percentage basis the amount earned by salvors, and the opinion in the Puebla Case shows that it was the purpose of the court to allow to the salvors a moderately liberal compensation for the services rendered, considering the merit of the service, the value of the property saved, and all the facts and circumstances appearing. And it is the purpose of the court in this case to allow a moderately liberal compensation, which I think has been honestly earned. I do take into account the value of the Elm Branch, which was $150,000; also the value of the Tyee, which was $70,000; and all other facts herein narrated; and I award a less amount of salvage in this case than in the Puebla Case because the value of the property saved is less, and the labor of the salvors is less arduous, and the Elm Branch is not a passenger ship. I consider that there is no injustice in fixing an amount which, on a percentage basis, may appear to be more liberal than was allowed in the Puebla Case, although it actually amounts to less than half of the total award in that case. This illustrates the impracticability of attempting to apply to different cases an arbitrary rule for measuring the compensation of salvors. In a case in which the property in peril is of great value, and the rescue is easily accomplished, without exposure to great danger, a very small percentage might amount to an excessive allowance; and in a different case, where the property saved is worth only a few thousand dollars, although the merit of salvage service may be much greater, a high percentage would make an inadequate award. In view of all the facts and circumstances, I consider the following sums to be reasonable, and award the same to the salvors in this case: To the Puget Sound Tugboat Company, owner of the Tyee, $6,000; to Capt. Bailey, master of the Tyee, $600; to H. G. Williams, mate, $300; to H. Harkins, chief engineer, $300; to H. F. Flint, assistant engineer, $200; to the Chinese cabin boy, $25; and to each of the other 10 men constituting the crew, $75. I make no further allowance for interest. A decree will be entered in accordance with this opinion.