## THE SANTURCE.

(District Court, S. D. New York.   March 27, 1905.)

SALVAGE—AMOUNT OF AWARD—TOWING DISABLED VESSEL AT SEA.

The freight steamer Santurce, on a voyage from Porto Rico to New York, when in the vicinity of the Bahamas became almost wholly disabled by the breaking of her propeller blades, and, after proceeding with sails for three days, in answer to her distress signals was taken in tow by the Rosewood on a voyage from Portugal to New Orleans, with a cargo of ore, and towed to Nassau, a distance of about 240 miles.   The service delayed the Rosewood about 2¼ days, and she was subjected to some danger, owing to unfavorable weather.   The time was early in January, and the Santurce was in a position of considerable peril.   Each vessel was of a net tonnage of about 1,100.   The Santurce, with cargo and freight, was of a value of $210,000; and the Rosewood, $70,000.   *Held*, that the Rosewood was entitled to a salvage award of $10,000, in addition to disbursements; 25 per cent. to go to the officers and crew.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, §§ 80–83.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty.   Suit to recover salvage.

Convers & Kirlin and John M. Woolsey, for libellant.
Wing, Putnam & Burlingham, for claimant.

ADAMS, District Judge.   This was an action brought by Richard C. Oliver, master of the steamship Rosewood, against the steamship Santurce, to recover salvage compensation, with disbursements, for services rendered to her and cargo, in the vicinity of the Bahama Islands from January 4th to 6th, 1905.

On the 18th of December, 1904, the Santurce arrived at Porto Rico from New York with two propeller blades gone and upon the advice of surveyors there, she loaded only a small cargo of sugar, about 363 tons, for the return voyage, while her carrying capacity was 2000 tons.   She was trimmed about 6 feet by the stern.   Her draft was 7 feet 3 inches forward and 13 feet 10 inches aft.   On the 28th of December, she started for New York, under easy steam, aided by her fore and aft sails.   She carried a spare propeller between decks.   On the 31st of December, when in latitude 26° 32', longitude 68° 59', the greater portion of all of her propeller blades was carried away.   The wind being favorable, she then set four regular stay sails and try sails, measuring 2873 feet, and used her awnings to make four additional sails, measuring 2125 feet.   She changed her course towards Nassau, seeking an opportunity in some harbor to ship the spare propeller, the master intending, however, to keep away from dangerous locations and if assistance were not obtained, to attempt to reach the coast of the United States.   On January 1st she made 93 miles, on the 2nd 82 miles, and on the 3rd 61 miles.   In the afternoon of the 3rd, the Rosewood was sighted and signalled by a rocket, the Santurce burning distress signals.   The Rosewood approached to within about a half of a mile and stopped, whereupon the Santurce's chief mate went to the former in a small boat.

The Rosewood was bound from Portugal to New Orleans, with a cargo of ore. She was deeply laden, having at the beginning of the voyage, a freeboard of but 1 foot and 10 inches. She sighted the signals of the Santurce about 5.30 o'clock P. M. and bore down upon her, and received the chief mate of the Santurce. An agreement was then made to tow the latter to Nassau.

Both vessels were cargo steamers of about the same dimensions. The Rosewood was 259 feet long. Her tonnage was 1737 gross and 1104 net. The Santurce was 255 feet long. Her tonnage was 1836 gross and 1122 net. The latter was a single screw vessel equipped with a four bladed propeller, 12 feet in diameter, the length of the blade having been about 5 feet and the diameter of the boss about 2 feet. The value of the Santurce was $175,000, her cargo $34,178.78, and her freight $1093.50. The value of the Rosewood was $70,000.

After the agreement to tow was made, no steps were taken that evening to carry it into effect, owing to darkness coming on and the weather being boisterous, but in the morning of the 4th, a steel wire bridle having been prepared on the Rosewood, a buoy from her to the Santurce was floated down, by means of which a 12 inch manilla hawser was run between the vessels. The tow started, about 8.30 A. M. very slowly at first, the Rosewood's engines making only 15 or 16 revolutions per minute, but gradually increasing to 30 revolutions at 11 o'clock and to 32 at 1 o'clock P. M. Her full speed of 54 revolutions was not attained until the next day. There is some difference between the vessels with respect to the positions they were in when the towage began, the Rosewood putting the longitude at 73° 23' and the Santurce 73° 35'. This variance would make a difference of about 11 miles but being so slight, it is not important to determine which was correct.

It is claimed by the libellant that the weather was stormy and the sea rough on the 4th, 5th, and 6th, and by the Santurce that they were moderate. It is probable that the views of the witnesses were somewhat influenced by their respective interests, as well as by the difference in the freeboards of the vessels, the Santurce being so high out of the water that the waves seemed small to those on her, while the deep immersion of the Rosewood tended to increase the estimates of her crew as to the severity of the weather. The testimony shows that the winds were high and the sea rough but nothing occurred to do any damage, except some wear on the towing apparatus, and the weather may be regarded as not very perilous to either vessel. It is no doubt true that towing on the ocean is always attended with more or less risk to both vessels and the existence of some danger must be considered, even though it turns out to have been slight.

During a part of the towing the wind was fair and part of the time somewhat adverse. The testimony in this respect shows that the services of the Rosewood were timely and necessary, though it is possible that the Santurce might by her sailing power have avoided any danger of stranding by keeping away from the vicinity of the Bahama Islands, but she would have been subject to it

from easterly storms on the coast of the United States. Her master, however, recognizing the necessity for assistance, caused distress signals to be exhibited and quickly availed himself of the Rosewood's services.

The vessels reached the vicinity of Nassau about 11:15 A. M. the morning of the 6th and anchored. Subsequently the Rosewood took on 15 tons of coal, communicated with her owners and, late in the afternoon, proceeded on her voyage to New Orleans. The Santurce secured the services of a tug and was taken into the inner harbor, where she was tipped by the shifting of cargo, her broken propeller was removed and the spare one shipped by her own men, with the aid of carpenters from the shore making floats. The work was completed on the 17th of January and her cargo being properly stowed, she started for New York the 19th, reaching there the 24th.

Nothing of importance occurred during the towing to Nassau. The Rosewood lost of actual time in getting on her original voyage again about 2¼ days. On her voyage to New Orleans, she was bound on a course which would have brought her in the vicinity of the Great Abaco Light, or the Hole in the Wall, therefore, she did not deviate very much in rendering the service. Many of the elements of meritorious salvage services, however, are present in this case. They were rendered with promptitude, and some skill and energy exhibited. There was some risk in rendering the service owing to unfavorable weather, as well as to the hazard which always accompanies an undertaking of this kind. Property of considerable value was rescued from a position of some danger. It is urged that the Santurce was in the track of commerce and doubtless would have received other assistance. No other efficient vessels, however, came to her aid and if they had, would doubtless have been entitled to as much salvage compensation as will be granted here.

Another feature of the case is the claim that the propeller of the Santurce still retained some efficiency. It is estimated that 10% of the original power remained but it is obvious that there was not enough to give the navigating officers any confidence in the steamship's ability to take care of herself, hence the exhibition of distress signals and the resort to the first available assistance. It is probably true that the steamship was almost completely disabled, as her log shows, so far as her own motive steam power was concerned in any adverse weather and it satisfactorily appears that her sailing power was dependent upon favorable winds, which were uncertain. Her propeller was used during the sailing and towing but apparently more for the purpose of allowing it to turn with a view to removing resistance than from any actual aid it would afford in the progress, although the log says in one place it was to assist the sails. When the Rosewood was asked for aid, she was advised that the Santurce was helpless. When aid is rendered upon such a representation, it is questionable whether the party making it is not estopped from denying that such was the condition. However that may be, I regard that the Santurce was,

for the purposes of the case, in practically a helpless condition and in great need of the Rosewood's assistance. There is no testimony to show that there was any available anchorage among the reefs of this vicinity and it was doubtless advisable for this reason also that the Santurce should have aid.

The Rosewood was no doubt subjected to some danger in the ocean towing, as alluded to above, and the evidence shows that the thrust block had been started and the tail and shaft worn down, apparently owing to the pressure involved in the towage. The distance towed was about 240 miles.

The Rosewood is entitled to be reimbursed for the actual expenses incurred. It appears by agreement, that certain expenses at Nassau should be allowed: They amounted to $216 44

Other claims are made on behalf of the Rosewood as follows:

Detention due to towage, on the basis of 2¼ days at demurrage rate provided for by charter £30 per day........ $327 37

Removing bolts on warping chocks started by the strain of towage ............................................ 15 00

Damage to thrust block................................ 60 00

Estimated delay in making engine room repairs, 3 days @ $145.50 ........................................... 436 50

Expense of replacing new wire hawser, injured in towage.. 50 00

It is claimed that the steamship had expected to arrive in New Orleans on the 7th of January and she did not reach there by reason of these services until several days later, and thus was forced to employ men to hastily put up shifting boards in order to save a cancelling date of charter, which would otherwise have been done by the crew on board ................................................ 185 00

The figures given in connection with many of the items are mere estimates and several of the claims are not in a condition to be allowed as disbursements or as actual losses. The only ones legally proved are $216.44, $327.39 and $185, making $728.81, which the owners of the Rosewood are entitled to recover. The remainder of the items can not be specifically allowed, owing to deficiency of proof, but the fact that the Rosewood was liable to be put to some expense in these particulars may be considered in making the salvage award.

The question of the proper amount of salvage to be allowed is a difficult one. The libellant asks for from $12,000 to $15,000 in addition to the total of the items given above. The claimant urges that $50 per hour while towing ($2,500) and $25 per hour while lying by (say $500), or $3,000 in addition to the disbursements of about $400 according to the claimant's contention, and an allowance of $500 to $600 to the master and crew, so that the entire recovery shall not exceed $4,000, will be ample.

Numerous authorities have been cited on both sides, but none closely in point. Many of them were passenger carrying vessels and not applicable here for that as well as other reasons.

The libellant urges that a good basis on which to start a com-

pensation would be to take a number of similar values and compute the rate allowed for the towage of $1,000 worth of value for one mile and submits the following list of cases:

| Name. | Miles. | Thousands. | Award. | Rate. |
|---|---|---|---|---|
| California .............................. 36 Fed. 563. | 250 | 260 | 15,000 | .23 |
| Benison ............................... 36 Fed. 793. | 60 | 200 | 7,000 | .583 |
| Tancarville ........................... 45 Fed. 903. | 360 | 87 | 8,000 | .255 |
| Wellington ............................ 52 Fed. 605. | 150 | 100 | 12,500 | .833 |
| Akaba ................................ 54 Fed. 197, 4 C. C. A. 281. | 130 | 130 | 30,000 | 1.775 |
| Great Northern ........................ 72 Fed. 678. | 125 | 100 | 10,000 | .80 |
| Dupuy de Lome ........................ 60 Fed. 921, 9 C. C. A. 292. | 97 | 110 | 18,700 | 1.76 |
| Chinese Prince ........................ 61 Fed. 697. | 70 | 250 | 5,000 | .285 |
| Phœnix ............................... 62 Fed. 487, 10 C. C. A. 506. | 300 | 160 | 20,000 | .417 |
| Florence ............................. 71 Fed. 527, 18 C. C. A. 240. | 140 | 240 | 8,500 | .252 |
| Alaska ............................... 75 Fed. 430. | 250 | 150 | 7,500 | .20 |
| Catalina ............................. 105 Fed. 633, 44 C. C. A. 638. | 60 | 200 | 2,400 | .20 |
| Erin ................................. 36 Fed. 712. | 240 | 26 | 4,000 | .64 |

It is urged that The Florence and The Tancarville, supra, cases in this district, are fair analogies to be used as guides in the present case and that an average between the two, .253, taking the distance towed here as 240 miles and the value as $210,000, would bring this award to $12,751.20.

The claimant of the Santurce also submits a list of cases as follows:

Values not over $200,000.

| Salved Vessel. | Value Salved. | Service. | Award. |
|---|---|---|---|
| Saragossa ................... 1 Ben. 551, Fed. Cas. No. 12,334. | $100,000 | 4 hours, 65 miles.......... | $ 900 |
| Saragossa ................... 1 Ben. 553, Fed. Cas. No. 12,335. | 100,000 | 34 hours ................. | 9,000 |
| Rebecca Clyde ............. 5 Ben. 98, Fed. Cas. No. 11,621. | 70,000 | 9 hours, lost 24 hours...... | 4,000 |
| E. B. Souder................ 7 Ben. 550, Fed. Cas. No. 4,455. | 200,000 | 18 hours, 100 miles........ | 3,000 |
| 15 Blatch. 185, Fed. Cas. No. 4,458. | | Reduced on appeal to...... | 1,000 |
| Rosedale ................... 20 Fed. 447. | 100,000 | 2 hours, and passengers forwarded ................. | 1,000 |
| Swiftsure .................. 29 Fed. 462. | 185,000 | Fog, 15 miles ............. | 4,000 |
| Erin ...................... 36 Fed. 712. | 26,000 | 240 miles. Dangerous coast | 4,000 |

Benison ..................... 199,500
36 Fed. 793.
10 hours. Hawser broken. Benison having had stem carried away by collision — 7,500

Pomona .................... 14,330
37 Fed. 444.
240 miles to Charleston, S. C. .................... 2,000

Tancarville ...,............ 87,432
45 Fed. 903.
50 hours towage to New York ................... 8,200

Sirius ..................... 143,539
57 Fed. 851, 6 C. C. A. 614.
Towage 320 miles to San Diego (4 days) .......... 8,000

Akaba ..................... 130,000
54 Fed. 197, 4 C. C. A. 281.
Towage from off Hatteras to Hampton Roads (three days) ................... 30,000

Phœnix ..................... 160,000
62 Fed. 487, 10 C. C. A. 506.
Four days towing in February, 375 miles in gales and fog to Hampton Roads .................. 20,000

Great Northern ............. 100,000
72 Fed. 678.
Broken shaft off Hatteras. Towed 125 miles to Hampton Roads ........ 10,000

Gambetta ................... 26,500
74 Fed. 260, 20 C. C. A. 417.
Disabled; towed 520 miles to mouth of the Mississippi ................... 2,216

Alaska ..................... 152,250
75 Fed. 430.
Str. out of coal, towed 250 miles to New York ..... 7,500

Waverly ................... 67,000
78 Fed. 191.
Engine broken down, towed 20 miles to Milwaukee... 1,500

Elm Branch ................ 150,000
106 Fed. 952.
Steamer without propeller towed by ocean tug into Port Townsend ......... 8,175

Values over $200,000, not exceeding $400,000.

Adirondack ................. $300,000
2 Fed. 387.
5 days, 662 miles.......... $ 7,500

Leipsic .................... 264,000
5 Fed. 108.
24 hours, 125 miles ....... 3,750

Leipsic .................... 264,000
10 Fed. 585.
24 hours, 125 miles. Increased to $5,500 on appeal.

D. Steinman ................ 252,000
19 Fed. 918.
Towage, 630 miles......... 25,000

California .................. 260,000
36 Fed. 563.
Towage, 300 miles. Lost a week by putting back.... 15,000

Veendam ................... 375,000
46 Fed. 489.
Towage, 191 miles while engines repairing. Veendam then came to port unassisted ............. 8,500

Dupuy de Lome ............. 224,600
60 Fed. 921, 9 C. C. A. 292.
4 days' towage during a 'Norther' in Gulf Mexico 18,716

Chinese Prince ............. 250,000
61 Fed. 697.
69 miles to Charleston.... 5,000

Hekla ...................... 213,300
62 Fed. 941.
Cattle steamer turning back and towing passenger steamer 750 miles (lost 12 days) ................ 30,000

Spokane ................... 320,000
67 Fed. 254.
Towed from off Manistee in L. Michigan to Milwaukee during storm. 24 hours' delay .................. 3,600

City of Para ............... 335,000
69 Fed. 479.
Passenger steamer towed 325 miles into Hampton Roads ................. 7,554

Florence ................... 240,000
65 Fed. 248.
71 Fed. 527, 18 C. C. A. 240.
Towage 140 miles to N. Y., with 4 to 5 days' delay.. 8,500

| | | | |
|---|---|---|---|
| Obdam .................... 72 Fed. 543. | 384,000 | Passenger stmr. towed 200 m. from off Sable Island to Halifax, losing 2½ days ................... | ·18,000 |
| Strathnevis ................ 76 Fed. 855. | 220,000 | To Miowera towing stmr. without propeller 450 m. in severe weather, then lost her in storm........ | 25,200 |
| | | To Mineola for bringing her from dangerous anchorage to Port Townsend ................... | 20,500 |
| City of Puebla ............ 79 Fed. 982. | 343,000 | Stmr., broken crank pin, towed in high seas into Port Townsend ......... | 16,000 |
| Catalina ................... 105 Fed. 633, 44 C. C. A. 638. | 200,000 | Stmr. disabled, towed to mouth of Mississippi — about 60 m. in good weather ................ | 2,400 |
| Ereza ..................... 124 Fed. 659. | 269,250 | Steamship losing propeller blades towed in winter 415 miles to Del. Breakwater, involving 9 days' delay, with about $1,500 disbursements .......... | 20,000 |

### Values over $400,000.

| | | | |
|---|---|---|---|
| Colon ..................... 10 Ben. 60, Fed. Cas. No. 3,024. 4 Fed. 469. | $480,000 | 6 days, 731 miles, Etna detained 2½ days ......... | $10,000 |
| Edam ..................... 13 Fed. 135. | 450,000 | One week lost. Vessel in great danger ........... | 25,000 |
| Alaska ..................... 23 Fed. 597. | 1,041,542 | Steamer used slower stmr. as rudder 600 miles..... | 26,039 |
| Gallego ................... 30 Fed. 271. | 476,000 | Eight days' loss. Steamer in danger .............. | 25,000 |
| Wisconsin ................. 30 Fed. 879 | 505,234 | Seven hours' steering rudderless stmr. ........... | 4,000 |
| Italia ..................... 42 Fed. 416. | 473,421 | 750 m. to N. Y. towing steamer only partially disabled, assisting with own engines ............ | 25,000 |
| Chas. Wetmore ............ 51 Fed. 449. | 409,219 | Towage steamer disabled drifting upon lee shore with serious damage to saloon, crossing bar Columbia River .......... | 20,000 |
| Chatfield .................. 52 Fed. 479. | 435,000 | Brixham first towed steamer within 43 m. of Cape Henry (9 hours) and City of Augusta towed her into Hampton Roads (12 hours) ................. | 27,000 |
| Dania ..................... 70 Fed. 398. | 426,000 | Stmr. broken shaft towed 360 m. to N. Y., 2 days and 2 hours ............ | 17,500 |
| Winifred ................... 102 Fed. 988. | 710,000 | Stmr. disabled; lost smokestack; towed 250 m. to Nassau; hawsers twice parted ................ | 23,000 |

Special stress is laid by the claimant upon the award in The Colon, supra. That was a case arising in the same vicinity as this,

where there was a salved value of $480,000 and a towage of 731 miles. The Colon was one of a line of passenger carrying steamers, running between New York and Colon. She had a non-perishable cargo on board worth $250,000, which formed a part of the saved value. On the occasion in question, she was bound for the latter place and broke her crank shaft. She incurred damage thereby that could not be repaired at sea, nor could she be sailed efficiently without disconnecting her propeller, excepting with a favorable wind, which was generally towards New York. It was said by Judge Blatchford that the part of the ocean where the Colon lay disabled, latitude 28° 17′ north, longitude 74° west, was much frequented by both steam and sail vessels. The accident happened on the 20th of August, 1876, about 11 o'clock in the forenoon. A few hours afterwards the steamship Etna, worth with cargo $200,000, bound for New York, came in sight and was engaged to tow the Colon back to New York. Each vessel furnished a hawser. They got under way about 7 o'clock in the evening and reached New York early in the morning of the 26th of August. During the towing the weather was fine and nothing occurred to interrupt progress, except the stranding of the Etna's hawser, which caused a short stoppage while it was being repaired. Both vessels used their sails. The salving vessel there demanded $150,000. A salvage compensation of $10,000 was awarded by the district court, which included $5,125 paid by the owners to master and crew. A further sum of $2,200.28, covering costs, was allowed to certain consignees of cargo, damaged by the detention. The salvor's appeal was disallowed with costs.

The award in The Colon tends to sustain the claimant's contention.

All salvage cases, however, must stand to a certain extent upon their own merits and be governed by the discretion of the court, which is naturally influenced by a desire to award such an amount as will prove an incentive to salving vessels to perform the services required of them, without inflicting too heavy a burden upon the saved property. Having these considerations, as well as the special facts of the case in view, I conclude that an award of $10,000 will be proper, 25% of which will go to the officers and crew of the Rosewood in proportion to their wages, excepting that the master will have a double share.

Decree for libellant accordingly.