THE CHINESE PRINCE.

OCEAN STEAMSHIP CO. OF SAVANNAH, GA., **v.** THE CHINESE PRINCE.

(District Court, E. D. South Carolina. May 26, 1894.)

SALVAGE—AMOUNT—TOWAGE—EVIDENCE.

The steamship Chinese Prince, when off Cape Romaine, in the latter part of December, broke her piston rod and the head of her high-pressure cylinder. She was some 13 miles from shore, in water from 9 to 13 fathoms deep, and in the track of coastwise vessels. She might have repaired damages in about 40 hours, and proceeded to port under sail and her low-pressure engine; but she signaled for assistance, and about midnight was taken in tow by the steamboat Dessoug, and brought into Charleston the next day. At the time of the accident, and for some days after, the weather was good, and at no time did either vessel incur extraordinary risk, or were the lives of their crews in danger. The detention did not interfere with the regular scheduled trips of the Dessoug out of her home port, Savannah, but she incurred extra expenses to the amount of $750. The value of the Chinese Prince and her cargo was from $225,000 to $250,000; that of the Dessoug, about $140,000. *Held,* that the Dessoug rendered a salvage service, for which $5,000 is an adequate reward, covering also the extra expenses.

This was a libel on final hearing by the Ocean Steamship Company of Savannah, owners of the steamship Dessoug, against the steamship Chinese Prince (Atkinson, claimant).

Mitchell & Smith, for libelant.

Trenholm, Rhett & Miller and Convers & Kirlin, for claimant.

BRAWLEY, District Judge. The British steamship Chinese Prince, loaded with cotton for Barcelona, left the port of Charleston at 2 p. m., December 20, 1893, intending to put in at Norfolk for coal. When off Cape Romaine, about 60 miles from Charleston, the piston rods broke, and the cylinder head of her high-pressure engine was shattered, and other damage was done to the water-service pipes. Almost immediately after the accident, the American steamship Dessoug, belonging to the Ocean Steamship Company, on her regular course from Philadelphia to Savannah, was hailed, and after some parley the Chinese Prince was taken in tow, and, starting at about 12:45, arrived off the bar of Charleston about 10 o'clock on the morning of the 21st, having taken a pilot meanwhile, and after waiting for the tide, and with the assistance of a tug, safely crossed the bar, and came to anchor inside the harbor at about 5:30 in the afternoon of the same day.

It is for this service that the libel in rem is filed, and the sum of $20,000 is claimed. The answer admits a meritorious salvage service, and asks that the same be compensated by a moderate award. There are many and divers ingredients which enter into a salvage service, and a long course of judicial decisions has determined what circumstances are most material for consideration. The degree of danger to life and property, and the value of the thing salved, is, in all cases, of the first importance. It has not been claimed or proved that any lives were in jeopardy, and this eliminates one of the ingredients which enhances the claims of salvors. The contention here relates mainly to the peril to the ship and cargo, and that will be first considered. The locality, the condition of weather and sea,

and the extent of the disability, are the necessary elements in determination of that question.

The testimony as to the locality differs somewhat from the averments of the libel, where the latitude and longitude are given by "dead reckoning;" and there are other discrepancies as to the distance of the disabled ship from Cape Romaine light, some of the witnesses putting it at 25 miles. As they all agree that they were in sight of this light, and as the United States charts fix its visibility at 18½ miles, the conclusion is that the Chinese Prince, at the time of the accident was about 18 miles northeast of Cape Romaine, and about 12 or 13 miles from shore, in water varying from 13 to 9 fathoms. She was directly in the course of coastwise vessels, and several other steamers were sighted that night. The accident occurred at a season when bad weather may be looked for on that coast. But the proof shows that there was a bright moonlight, and a light wind; a smooth sea, with some swell from the southeast. The captain of the Dessoug does say that the weather was threatening,—"mackerel skies and mares' tails,"—but the event proved that his apprehensions were not justified, for the breeze died out towards morning, and the records of the weather bureau show that the velocity of the wind did not exceed 13 miles an hour at any time that night, decreased to 8 miles the next morning, followed during the day by a dead calm. The disability was caused by the breaking of the cylinder head of the high-pressure engine. It is conceded that there were no appliances aboard ship for repairing such injury, and the extent of the damage may be inferred from the fact that several weeks were required to repair the same after the return to Charleston. The officers of the ship claim that they could have disconnected the high-pressure engine, and with the low-pressure engine the ship could have made three or four knots an hour, and have gone safely into port; that this could have been done within 36 or 40 hours; and that there were aboard ship the necessary appliances for such repairs. The testimony of one of the libelant's witnesses that he did not see any such appliances does not negative this proof, and it may be concluded that the ship might, within 40 hours, have been put into condition, with her low-pressure engines and her sails, to have helped herself, and, if the weather had continued good might have reached port without assistance. Speculation as to the result of such endeavor is needless, as her captain did not choose to be saved in that way; but the consideration of such facts, and of the possibility of the ship being rescued by other passing steamers, is material in determining the degree of peril from which she was salved. The conclusion is that the Chinese Prince was disabled but not helpless, and that the pretensions of the salvors that she was rescued from imminent peril are not sustained by the proofs. The conjecture that she was drifting rapidly towards the shoals rests mainly upon inference that does not support it. It arises out of the testimony that at the time when the accident occurred the soundings showed 13 fathoms of water, and when the towage began the soundings showed 9 fathoms, and therefore it is inferred that she was being driven upon shore; but the coast-survey charts do not show a uniform depth at that point, with a gradual shelving towards shore, but a variation

of several fathoms—from $7\frac{1}{2}$ to 13—at equal distances from the coast; and the captain of the Dessoug says, "I do not pretend to say that this ship was drifting at that time." With ample ground tackle, and with such weather and sea, it is not to be conceived that there was any real danger of the steamship being carried upon the shoals. It was conceded in the argument, and the testimony supports it, that the Chinese Prince was worth about $40,000, and her cargo—5,050 bales of cotton—is valued in the manifest at $199,423. It is contended that this valuation is excessive, in that it states what the cotton would be worth upon arrival in Spain, and not its value at the port of shipment. It is unnecessary to consider whether the parties are not estopped from alleging against the sworn statement in the manifest. The award will not be fixed upon the basis of a percentage, as that is not the best measure of the value of salvage services. Adequate reward according to the circumstances of the case is the better rule. For the purposes of this case, it is considered that the value of ship, cargo, and freight is from $225,000 to $250,000.

There is some contention as to whether signals of distress were shown upon the Chinese Prince, as alleged in the libel. Her officers say that the only signals displayed were the three vertical lights, which indicated that the ship was not under control, while some of the libelant's witnesses say that she showed flash lights at intervals of five minutes. Our statutes prescribe what "signals of distress" shall be, and the flash light is not one of those named. As it is not disputed that the Chinese Prince desired assistance, it is immaterial whether that desire was made manifest by the display of a flash light, or by the hailing of the Dessoug. Any ambiguous signal will be construed according to the condition of the vessel when boarded. If she is disabled, and in need of assistance, the signal will be treated as a signal for assistance, and those answering it will be regarded as salvors.

The next subject for consideration regards the salvor, and involves an inquiry into the value of the property engaged in the salvage service, the risks to which it was exposed, the enterprise and skill displayed, and the dangers incident thereto, with the attendant responsibilities, the time and labor expended, with the loss and expenses incurred in its performance; including risks as to insurance, and other liabilities from deviation and delay and loss of trade. The Dessoug was an old ship, bought by libelants, many years ago, for $40,000, and repaired and fitted with new engines, about 10 years ago, at a cost of $65,000, and insured for $90,000. The cargo was valued at $48,000. The salvage service was wholly unattended with any risk of human life, and the circumstances called for no especial courage, enterprise or skill. All that the occasion demanded was done with intelligence and promptitude, and the danger involved was such only as is necessarily implied in handling at sea a disabled steamship, heavily laden, in such weather as has been described. As there is no proof that any except superficial repairs were required or made to the Dessoug, it may be assumed that the strain was not excessive. The service was performed subsequent to the act of February 13, 1893, and any liability for deviation in respect to the cargo is protected under that act, even if the bill of lading contained **no**

stipulation allowing such deviation for salvage purposes. The policy of insurance was not produced; and, in the absence of any evidence that her insurance was risked, it cannot be presumed that it contained any inhibition against the rendition of salvage services. The Dessoug made fast to the Chinese Prince, and commenced the towage, about 12 o'clock on the night of December 20th, arrived off the bar at Charleston—a distance of about 69 miles—early next morning, but, owing to the tide, could not cross until the afternoon, when she came to safe anchorage in the harbor at 5:30. She could have gone out on the same tide, if she had sailed immediately; but, desiring to consult counsel, her captain came ashore, and she was detained until the following morning. By employing some extra help in unloading her cargo at Savannah, she proceeded at her advertised time on her next voyage to Philadelphia, missing no sailing date. The expenses incurred were: For the tug Hercules, in crossing the bar, $500; for pilotage, $168; and for extra coal consumed, 40 tons, which, at the price paid in Philadelphia, would be about $100. A good deal of testimony was offered regarding the breaking of the hawser while the ships were lying off the bar; but as it is not perceived that this incident has any special significance, as affecting the amount of the award, it is unnecessary to consider it. It is conceded that this is a case of salvage as distinguished from mere towage service, but it lies near the border land; and many of the ingredients which justify a large award are either absent, or present in such low degree that the compensation cannot, in justice, be greatly more than a liberal remuneration pro opere et labore. There was no imminent peril, and no heroic rescue; no risk of life to either salvors or salved. The ship lay within sight of land, with fair weather, and in the track of a number of vessels passing daily up and down the coast, the possibility of assistance from which must be taken into account, as tending to lessen the award. Such assistance and such service as the circumstances demanded were rendered promptly, unhesitatingly, and successfully. The parties did not agree with each other as to the compensation to be paid, not because of any disagreement over terms, but by reason of the refusal of the master of the Dessoug to consider the proposition of the master of the Chinese Prince; he informing the latter that this was a question to be determined by his owners, who were "good people, and would do what was right." Inasmuch as the parties have failed to reach an agreement as to "what is right" it is for this court to determine it according to its discretion, enlightened by such assistance as comes from the consideration of the decided cases. It will serve no good purpose to review the cases which have been presented by the counsel on either side with consummate skill and learning. They have all been duly considered. The general principle which should govern is nowhere stated more admirably than by Mr. Justice Bradley in The Suliote, 5 Fed. 99:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune, conferred without any regard to the loss or sufferings of the owner, who is a public enemy. Salvage is a reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring efforts of those who have it in their power to furnish aid and succor. Anything

beyond this would be foreign to the principles and purposes of salvage. Anything short of this would not secure its objects. The courts should be liberal, but not extravagant; otherwise, that which is intended to be encouragement to rescue property from destruction may be a temptation to subject it to peril."

It is considered and adjudged that the libelant is entitled to $5,000 as remuneration for the salvage services rendered, which sum includes an allowance for the expenses of the tug, pilotage, and coal. As there was no tender or payment of money into court, the costs must follow the decree. Let a decree be entered in conformity with this opinion.