## THE EREZA.

(District Court, E. D. Pennsylvania. July 29, 1903.)

### No. 19.

1. SALVAGE—COMPENSATION—ELEMENTS OF AWARD.
   The delay and injury to a vessel by grounding while on her way to another port for a supply of coal made necessary by her going out of her course on her voyage to tow a disabled ship to port are too remote. to be considered as elements in making a salvage award, even if the grounding was not due to her fault.

2. SAME—VALUE OF SALVOR'S CARGO—EFFECT OF HARTER ACT.
   In awarding compensation to a ship for salvage services rendered while she was on a voyage to or from a port of the United States, under section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), the value of her cargo and freight are to be excluded from consideration.

3. SAME—TOWING DISABLED STEAMSHIP TO PORT—AMOUNT OF COMPENSATION.
   The English steamship Yeoman, valued at $500,000, while on a voyage from Galveston to Liverpool, in February, with a cargo of cotton worth $900,000, sighted the Spanish steamship Ereza, 415 miles southeast of the Delaware capes, with a broken rudder and disabled, and at her request towed the Ereza to the Delaware breakwater on her way to Philadelphia. The weather was stormy and the sea rough, and the delay caused the Yeoman by the service, including the time for recoaling, was some eight or nine days. The Yeoman was a large and new ship of 7,379 tons gross register, and the service was well performed, without delay or injury to the Ereza or her cargo. The latter, on her arrival with cargo and freight, was of the value of $269,000. *Held* that, including compensation for expenses, delay, and the service itself, the Yeoman was entitled to an award of $20,000.

In Admiralty. Suit to recover for salvage services.

J. Rodman Paul and Howard H. Yocum, for libelant.

Harrington L. Putnam, for respondent.

J. B. McPHERSON, District Judge. This is a case of salvage, which presents the usual dispute concerning the sum to be awarded to the salvor in payment for expenses, delay, and meritorious service. The principal facts, which are for the most part not in controversy, are as follows:

The Ereza is a Spanish steamship of 4,838 tons gross, and 2,599 tons net, register, and was built of steel, in 1894. On January 18, 1902, she left the Austrian port of Fiume, bound for Philadelphia, carrying a cargo of 44,000 bags, or about 4,400 tons, of raw beet sugar, worth $124,520.12, upon which the amount of the marine freight was $9,737.30. When the ship arrived at the port of Philadelphia she was worth about $135,000, so that the total value of the vessel, cargo, and freight was something over $269,250. The British steamship Yeoman was built of steel in 1901, and is of 7,379 tons gross, and 4,784 tons net, register. At the time under consideration she was worth say $500,000, and was laden with a cargo of cotton valued at $900,000, upon which the freight at risk was about

¶ 3. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

$40,000; the total value of the vessel, cargo, and freight being, therefore, about $1,440,000. She carried a crew of 45 men, and was bound upon a voyage from Galveston to Liverpool. Neither vessel carried passengers or mails. The Ereza coaled at Gibraltar on January 25th and 26th, taking in 500 tons at that port, this being sufficient, with the quantity already on board, to last for 27 days. About the 1st of February she began to encounter severe weather, and from that day, for a period of three weeks, she was exposed to continuous and heavy storms. The seas were unusually large, breaking frequently over her deck, and she rolled and pitched with great violence. She was often obliged to slow down her engines, and at times was compelled to stop them for 8 or 12 hours at a time, in order to avoid damage from racing and to ease the plunging of the ship. Her progress was so moderate that upon February 18th, when she was 23 days out from Gibraltar, she was still more than 400 miles distant from the capes of the Delaware. Upon that day she broke the four blades of her propeller, and was thereby deprived of her steam motive power. She had an inferior set of sails—five in all—and these were set the next day, in order to steady the vessel, and perhaps to enable her to make some progress; but the violence of the wind was such that three of the sails were blown away in a few hours. For two days she drifted at the mercy of the wind and waves, and was carried to the southeastward from 90 to 100 miles out of her course. She was, however, still in the usual track of west-bound steamers from the Mediterranean, and was also near the track of north-bound steamers from the West Indies, as well as of some Gulf steamers bound eastward towards Europe. She had suffered damage from the severity of the weather—part of her bulwarks was broken down, the boiler feed-pump was injured, and she was taking in some water through the stern tube—but her hull was practically staunch and unimpaired, and she had provisions on board for four or five months. She saw no vessels during the two days between February 18th and February 20th, but on the afternoon of the 20th she sighted the Yeoman in latitude 36.15 N., longitude 67.25 W., about 415 miles from the capes. As the Yeoman approached the Ereza signaled, "Will you take me in tow?" to which the Yeoman replied by a request that the Spanish captain should come on board. In compliance with this request the captain of the Ereza, his chief officer, and his chief engineer, were taken to the Yeoman by one of their own boats. Neither the Spanish captain nor the chief officer could speak English, and the engineer, who acted as interpreter, was not very proficient in that language. Some misunderstanding may have occurred by reason of the difficulty of communication, but I attach no importance to this circumstance. An examination of the chart will show that the point at which the steamships met was west of north of the island of Bermuda, and nearer to Bermuda than either to Norfolk or Philadelphia. The Yeoman having signified her willingness to take the Ereza in tow, there was some discussion about the port to which the vessels should now be directed. Bermuda was considered—it is at this point that the misunderstanding may have taken place—but was finally rejected be-

cause neither captain had ever been to the island, and the captain of the Yeoman was afraid that the entrance to the harbor was not safe for a vessel as large as his. Moreover, no one on either ship knew whether the Ereza could be repaired upon the island; and manifestly, if such repairs as she needed were impossible there, another vessel must be found to take her to Norfolk or Philadelphia. It was decided, therefore—wisely, as I think—to proceed to the Delaware breakwater, and preparations for the tow were accordingly begun. Each vessel had a 4½ inch steel hawser, and these were both made fast to the anchor chains of the Ereza, one upon the port, and the other upon the starboard, bow. The tow began about 9 o'clock on the evening of February 20th, the Yeoman proceeding slowly at first, and afterwards increasing her speed. The weather was still tempestuous, but there was no particular difficulty during the first day of the voyage, 120 miles being made by noon of February 21st. In the afternoon of that day the weather became more violent, and toward evening it blew a hard gale, with heavy squalls and continuous rain. The Yeoman was obliged to slow down, and finally to lie to, in order to ease the strain on the hawsers. Very little progress was made during that night, and as the gale continued during the morning of February 22d not many miles were made by noon of that day. Toward noon of February 23d the wind and sea moderated somewhat, although the waves were still so high and towage so difficult that the progress made by noon on February 23d was not more than about 94 miles. The next day the weather cleared, with a light wind and a mild swell, and good speed was made, so that by 6 o'clock in the afternoon Henlopen light was sighted, and pilots were taken on board about 9 o'clock. Shortly afterwards the Yeoman took in her own hawser, and the tow continued with the aid of the Ereza's hawser alone. This snapped very soon, and was not reattached, for the breakwater was not far distant, and as there were many ships in that shelter, rendering it unsafe, in the judgment of the pilot, for these two large vessels to enter at night, the pilot boat Philadelphia was engaged by the Yeoman, at a cost of $200, to tow the Ereza to a place of safety. This was accordingly done, and the Ereza came to anchor shortly after midnight. Upon the next day her captain telegraphed to the ship's agents in Philadelphia for a tug, which was sent down promptly, and she began her voyage up the Delaware river about 10 o'clock in the evening of February 26th. The Yeoman remained at the breakwater until February 27th, and the captain explains the delay by declaring that, owing to a severe storm that prevailed along the coast and for some distance inland, he could not communicate with his owners in London in order to receive instructions. On February 26th, in reply to his telegram stating that he had towed the Ereza into port and needed a fresh supply of coal, his owners directed him to consult their agents at Philadelphia, and it was thereupon determined that the Yeoman should replenish her bunkers at Norfolk. She started for that port upon February 27th, and during a fog, about 1 o'clock on the morning of the next day, ran aground upon a sand bank near Cape Henry, where she was obliged to remain for 8 or 9 hours, until she was

floated off by the rising tide. She was apparently uninjured by the grounding, and proceeded at once to Norfolk, where she coaled on the afternoon of February 28th. On March 1st she took up her interrupted voyage to Liverpool, and on March 3d she reached a point corresponding substantially with the point where the tow began. This is a period of 10 days, and the delay of her voyage is put forward by the libelant as one element in the claim for salvage. No doubt a proper allowance for delay is always to be taken into account, but I do not think the full 10 days should be considered. I am not satisfied that all of the delay at the breakwater was unavoidable. The Spanish captain was able to telegraph at once to Philadelphia without difficulty, so far as appears, and no reason is disclosed by the testimony why the captain of the Yeoman could not have been equally successful. Moreover, the detention at Cape Henry caused by the vessel's grounding is too remote to be considered, even if the grounding was not due to the fault of the Yeoman in attempting to enter the Chesapeake at night in a fog, without taking a pilot on board. In this connection I may also say that the charge for docking, repairs, and painting done at Liverpool after the arrival of the Yeoman is not a proper subject for allowance. As I have already said, the grounding was an incident too remote to be considered, and even if the vessel was not in fault, and was injured to some extent by reason of that accident, the charge cannot properly be allowed.

I do not think it necessary to itemize the award that is to be made. I have taken into account the expenses of the vessel during the delay that is properly to be attributed to salvage service, the cost of the coal that was thereby made necessary, the sum paid the pilot boat Philadelphia, and other proper expenses at the breakwater, and the value of the time lost. The principal difficulty concerns the value of the service, and it is a difficulty that always confronts a court in the attempt to settle upon the amount of a salvage award. In coming to a conclusion, the value of each vessel should certainly be considered, and also the value of the cargo and freight that were saved. With regard to the value of the cargo and freight of the salvor, it is argued, and I think correctly argued, that the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) requires such value to be excluded. The third section of that statute provides that, if a vessel plying to or from a port of the United States shall be seaworthy, and properly manned, equipped, and supplied, at the beginning of the voyage, she shall not be liable to the cargo for losses arising from saving or attempting to save life or property at sea, or from any deviation in rendering such service. This being so, the value of the cargo at risk is no longer an element in determining what perils the salving vessel was obliged to encounter. The point has already been decided in the federal courts, and it is only necessary, I think, to refer to these decisions: The Chinese Prince (D. C.) 61 Fed. 699; The Florence (D. C.) 65 Fed. 248; The Alaska (D. C.) 75 Fed. 430.

Taking into consideration, therefore, the expenses to which I have already alluded, the value of the ships, and the value of the Ereza's

cargo and freight, the difficulty of the service, the length of time occupied, the dangers to which both vessels were exposed, the capacity of the Yeoman to do such service well, the admirable manner in which it was accomplished, and the success of the enterprise; and also taking into consideration, what is by no means to be neglected—the public policy that favors a fair and liberal award, in order that other ships may be induced to extend like aid to those in distress—I am of opinion that the meritorious service of the Yeoman, including the allowance for expenses and all other items of charge, should be compensated by an award of $20,000.

When the agreement to tow was entered into, the amount to be paid was left undetermined. The sum was to be settled by arbitration in London, but, so far as appears, no effort was made by either party to carry this agreement into effect. No demand for a specific sum is made in the libel, and none is tendered by the answer; the libelant's counsel suggesting $30,000 in his brief, while the counsel for the respondent admits that $4,565.63 should be allowed for disbursements and as recompense for time and service, and concedes that a sum should be added as a reward, "based upon the gallantry, courage, zeal, and intrepidity shown, also having regard to the value saved," apparently suggesting a small percentage, say 2½ per cent., on such value. There is sufficient range between these two suggestions to allow some freedom of movement, and I have exercised my best judgment to reach a fair and just result.

A decree may be entered in favor of the libelant for $20,000, with costs of suit.